Barry I. Levy (BL 2190)
Ryan Goldberg (RG 7570)
John P. Mulvaney (JM 0154)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for State Farm Mutual Automobile Insurance
Company and State Farm Fire and Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE AND CASUALTY COMPANY,                          Docket No.:_____ (      )

                    Plaintiffs,

          -against-                                 **Plaintiff Demands a Trial
                                                    by Jury**

TANDINGAN P.T. P.C.,
CHIROPRACTIC DIAGNOSTIC P.C.,
DIGNITY PT, P.C.,
MMA PHYSICAL THERAPY, P.C.,
THERAPY ZONE P.T. P.C.,
ROSS A. FIALKOV, D.C., P.C.,
MCDONALD AVE CHIROPRACTIC P.C.,
REHAB CARE PHYSICAL THERAPY P.C.,
COMFORT PHYSICAL THERAPY, PLLC,
RF CHIROPRACTIC IMAGING, P.C.,
ATLAS PT, P.C.,
MT PHYSICAL THERAPY P.C.,
ELMWOOD PARK MEDICAL GROUP PC,
BEST HANDS-ON PHYSICAL THERAPY, P.C.,
SUAREZ MEDICAL PLLC,
HEAL-RITE PT P.C.,
MOLNAR MEDICAL SERVICES PC,
WELLNESS PHYSICAL THERAPY
REHABILITATION PLLC,
PERLOFF PHYSICAL THERAPY, P.C.,
MILL MEDICAL P.C.,
MJG MEDICAL P.C.,
CROSSTOWN CHIROPRACTIC P.C.,
AXIS PT, P.C.,

MC PHYSICAL THERAPY PC,
INJE PHYSICAL THERAPY P.C.,
INEW REHAB PHYSICAL THERAPY P.C.,
RAINE M. PESIDAS PHYSICAL THERAPY P.C.,
LZ MEDICAL DIAGNOSTIC P.C.,
BETTER HANDS PHYSICAL THERAPY P.C.,
G.M. WELLNESS MEDICAL P.C.,

      -and-

MADONNA PARUNGO TANDINGAN, P.T.,
VLAD POGILDAKOV, D.C.,
MAZEN MOHAMED AHMED ALI ABDEL MAGID, P.T.,
ISLAM ABDELMOHSEN, P.T.,
ROSS A. FIALKOV, D.C.,
JOSEPH BATER, D.C.,
RHEA AMANTA CABRERA, P.T.,
MELISSA CADET, P.T.,
MOHAMED AWAD AWAD, P.T.,
KRISTAPPA SANGAVARAM, M.D.,
SANG WON YOO, P.T.,
DAVID PETER SUAREZ, D.O.,
ILYA PERLOFF, P.T. also known as
ILYA TEREKHOV, P.T.,
SHEILA SOMAN, M.D.,
MAX JEAN-GILLES, M.D.,
MILENA REYES, P.T.,
MICHELLE NESAS CUADRA, P.T.,
JAEYOUNG LEE, P.T.,
HAN NA YOO, P.T.,
RAINEGALE MARIE MENDIOLA PESIDAS, P.T.,
LILY ZARHIN, M.D.,
KRISTINE MAY BITANGA PARCON, P.T.,
GABOR MENCZELESZ, M.D.,

      -and-

SHOWTIME TRANSPORTATION CORP.,
SHOW TRANS CORP.,
BPNT CORP.,
1001 NY CORP.,
JNBJ ENTERPRISES CORP.,
JNMT CORP.,
MNDNT CORP.,
SHOWTIME II CORP.,
STGG ENTERPRISES CORP.,

RTNM CORP.,
ALL CITY CARS, INC.,

      -and-

ARTUR SATTAROV,
JASUR RAHMATOV,
VLADIMIR GEYKHMAN,
RAFAEL DJAFAROV,
TANYA KOZYREVA,
DIMITRIY SHEYNKMAN,
JOSEPH VASILEVSKY,
LEONID KOZACHKOV,
BELLA PYETROSYAN,
MAVJUDA TASHEVA,
DARYNA BURLAK,
MATLYUBA KHAKIMOVA,
FARIDDUN KULIEV,
SOJIDA BAKOEVA,
AMINA AGAMIRZAYEVA,
INNA LYUBRONETSKAYA also known as
INNA ZARETSER,

      -and-

JOHN DOE DEFENDANTS 1 – 10.

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire"), by and through their counsel, Rivkin Radler LLP, as and for their Complaint against the Defendants, allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to terminate an ongoing fraudulent scheme and to recover more than $1,677,000.00 that the Defendants wrongfully obtained from State Farm Mutual and State Farm Fire by submitting, or causing to be submitted, fraudulent no-fault insurance charges relating to medically unnecessary or otherwise non-reimbursable healthcare services, including but not

limited to computerized range of motion and muscle tests ("ROM/MT"), computerized activity limitation measurement tests ("ALM Tests"), and pain fiber nerve conduction studies ("PfNCS") (collectively, the "Fraudulent Services"), that the Defendants allegedly rendered to New York automobile accident victims covered by State Farm Mutual and State Farm Fire insurance policies ("Insureds").

2.    In addition to monetary relief, State Farm Mutual and State Farm Fire seek a declaration that they are not legally obligated to pay reimbursement of more than $5,905,000.00 in pending no-fault insurance claims submitted by or on behalf of Defendants Tandingan P.T. P.C. ("Tandingan PT"), Chiropractic Diagnostic P.C. ("Chiropractic Diagnostic"), Dignity PT, P.C. ("Dignity "PT"), MMA Physical Therapy, P.C. ("MMA PT"), Therapy Zone P.T. P.C. ("Therapy Zone"), Ross A. Fialkov, D.C., P.C. ("Fialkov PC"), McDonald Ave Chiropractic P.C. ("McDonald Ave Chiropractic"), Rehab Care Physical Therapy P.C. ("Rehab Care"), Comfort Physical Therapy, PLLC ("Comfort PT"), RF Chiropractic Imaging, P.C. ("RF Chiropractic"), Atlas PT, P.C. ("Atlas PT"), MT Physical Therapy P.C. ("MT PT"), Elmwood Park Medical Group PC ("Elmwood Park"), Best Hands-On Physical Therapy, P.C. ("Best Hands-On PT"), Suarez Medical PLLC ("Suarez Medical"), Heal-Rite PT P.C. ("Heal-Rite PT"), Molnar Medical Services PC ("Molnar Medical"), Wellness Physical Therapy Rehabilitation PLLC ("Wellness PT"), Perloff Physical Therapy, P.C. ("Perloff PT PC"), Mill Medical P.C. ("Mill Medical"), MJG Medical P.C. ("MJG Medical"), Crosstown Chiropractic P.C. ("Crosstown Chiropractic"), Axis PT, P.C. ("Axis PT"), MC Physical Therapy PC ("MC PT"), Inje Physical Therapy P.C. ("Inje PT"), Inew Rehab Physical Therapy P.C. ("Inew Rehab"), Raine M. Pesidas Physical Therapy P.C. ("Pesidas PT PC"), LZ Medical Diagnostic P.C. ("LZ Medical"), Better Hands Physical

Therapy P.C. ("Better Hands PT"), G.M. Wellness Medical P.C. ("GM Wellness"), and Max Jean-

Gilles, M.D. ("Jean-Gilles") (collectively, the "Provider Defendants") because:

     (i)     the Fraudulent Services were not provided because they were medically necessary, but were provided pursuant to a pre-determined treatment protocol that enriched the Defendants;

     (ii)    the Provider Defendants misrepresented and/or exaggerated the level of services they purportedly provided to inflate and/or unbundle the charges submitted to State Farm Mutual and State Farm Fire;

     (iii)   the Fraudulent Services were subject to the direction and control of individuals and entities not licensed to practice any healthcare profession in the State of New York, resulting in the performance of unnecessary services and billing for inflated charges to State Farm Mutual and State Farm Fire;

     (iv)   the Provider Defendants provided the Fraudulent Services pursuant to illegal kickback and referral arrangements that enriched the Defendants; and

     (v)    the Fraudulent Services were provided by independent contractor technicians, rather than by any of the Provider Defendants' employees.

3.     The Defendants fall into the following categories:

     (i)     The Provider Defendants are twenty-eight New York medical, chiropractic, and physical therapy professional corporations, two New Jersey medical professional corporations, and Jean-Gilles, a physician who submitted billing under his own name and tax identification number, through which the Fraudulent Services were purportedly performed on a transient basis at numerous New York no-fault "clinics" and billed to State Farm Mutual and State Farm Fire;

     (ii)    Defendants Madonna Parungo Tandingan, P.T. ("Tandingan"), Vlad Pogildakov, D.C. ("Pogildakov"), Mazen Mohamed Ahmed Ali Abdel Magid, P.T. ("Magid"), Islam Abdelmohsen, P.T. ("Abdelmohsen"), Ross A. Fialkov, D.C. ("Fialkov"), Joseph Bater, D.C. ("Bater"), Rhea Amanta Cabrera, P.T. ("Cabrera"), Melissa Cadet, P.T. ("Cadet"), Mohamed Awad Awad, P.T. ("Awad"), Kristappa Sangavaram, M.D. ("Sangavaram"), Sang Won Yoo, P.T. ("S. Yoo"), David Peter Suarez, D.O. ("Suarez"), Ilya Perloff, P.T. also known as Ilya Terekhov, P.T. ("Terekhov"), Sheila Soman, M.D. ("Soman"), Jean-Gilles, Milena Reyes, P.T. ("Reyes"), Michelle Nesas Cuadra, P.T. ("Cuadra"), Jaeyoung Lee, P.T. ("Lee"), Han Na Yoo, P.T. ("H. Yoo"), Rainegale Marie Mendiola Pesidas, P.T. ("Pesidas"), Lily Zarhin, M.D. ("Zarhin"), Kristine May Bitanga Parcon,

P.T. ("Parcon"), and Gabor Menczelesz, M.D. ("Menczelesz") (collectively, the "Nominal Owners") are licensed physicians, chiropractors, and physical therapists who are the listed owners of the Provider Defendants;

(iii)     Defendants Artur Sattarov ("Sattarov"), Jasur Rahmatov ("Rahmatov"), Vladimir Geykhman ("Geykhman"), Rafael Djafarov ("Djafarov"), Tanya Kozyreva ("Kozyreva"), Dimitriy Sheynkman ("Sheynkman"), Bella Pyetrosyan ("Pyetrosyan"), Mavjuda Tasheva ("Tasheva"), Daryna Burlak ("Burlak"), Matlyuba Khakimova ("Khakimova"), Fariddun Kuliev ("Kuliev"), Sojida Bakoeva ("Bakeova"), and Amina Agamirzayeva ("Agamirzayeva") (collectively, the "Layperson Controllers") are individuals not licensed in any healthcare profession who illegally own or control the Provider Defendants, paid kickbacks for patient referrals to the controllers and/or healthcare providers at the no-fault "clinics" from which the Provider Defendants operated, caused Insureds to be subject to the Fraudulent Services, and were responsible for recruiting licensed medical professionals willing to sell their professional licenses in order to perpetuate the fraudulent scheme;

(iv)     Showtime Transportation Corp. ("Showtime Transportation"), Show Trans Corp. ("Show Trans"), BPNT Corp. ("BPNT"), 1001 NY Corp. ("1001 NY"), JNBJ Enterprises Corp. ("JNBJ"), JNMT Corp. ("JNMT"), MNDNT Corp. ("MNDNT"), Showtime II Corp. ("Showtime II"), STGG Enterprises Corp. ("STGG"), RTNM Corp. ("RTNM"), and All City Cars, Inc. ("All City Cars") (the "Transportation Corporations") are corporations owned or controlled by one or more of the Layperson Controllers, which operated as ostensibly legitimate transportation companies and purported to provide transportation services to the Provider Defendants.  In reality, the Transportation Corporations did not actually provide legitimate services to the Provider Defendants; rather, the Transportation Corporations conspired with the Layperson Controllers and knowingly aided and abetted the fraudulent scheme by serving as vessels to receive proceeds from the fraudulent scheme, launder those proceeds for the Layperson Controllers' benefit, and conceal that the Layperson Controllers were the true operators of the fraudulent scheme;

(v)     Joseph Vasilevsky ("Vasilevsky") and Leonid Kozachkov ("Kozachkov") (the "Check Cashers") are individuals who conspired with the Layperson Controllers and knowingly aided and abetted the fraudulent scheme by cashing checks from many of the Provider Defendants (whether written to or from them) at check cashing facilities and submitting W-9 forms to the check cashing facilities in order to appear as if they had received legitimate authorization to cash such checks.  In reality, the Check Cashers had no such authority as they received the checks and W-9 forms from the Layperson Controllers and then submitted the false W-9 forms to the check

cashing facilities in order to conceal that the checks were the proceeds of the Defendants' fraudulent scheme.

(vi)   Inna Lyubronetskaya also known as Inna Zaretser ("Zaretser") is an individual who conspired with the Layperson Controllers and knowingly aided and abetted the fraudulent scheme by performing billing services on behalf of several of the Provider Defendants and distributing insurance payments she received on their behalf to the Layperson Controllers and/or Check Cashers, even though she knew that one or more of the Layperson Controllers controlled the respective Provider Defendants and that the healthcare professionals listed as the owners and treating providers on the bills she generated and submitted to State Farm Mutual and State Farm Fire did not actually perform the Fraudulent Services; and

(vii)   John Doe Defendants 1-10 are individuals and/or entities not presently identifiable that participated in the operation and control of the Provider Defendants, conspired with the Layperson Controllers in furtherance of the fraudulent scheme, and/or knowingly aided and abetted the fraudulent scheme.

4.     The Provider Defendants never had any right to bill for or to collect no-fault insurance benefits for the Fraudulent Services because, at all relevant times, they knew the Fraudulent Services were: (i) medically unnecessary, and were ordered and performed pursuant to a fraudulent pre-determined treatment protocol that served to maximize the charges that Provider Defendants could submit to State Farm Mutual and State Farm Fire, rather than to legitimately treat or otherwise benefit the Insureds; (ii) billed under codes that misrepresented and/or exaggerated the level or type of services in order to inflate and/or unbundle the charges submitted to State Farm Mutual and State Farm Fire; (iii) carried out at the direction of the Layperson Controllers; (iv) provided pursuant to illegal kickback and referral arrangements that enriched the Defendants; and (v) performed by independent contractor technicians, rather than by employees of the Provider Defendants.

5.     As such, the Provider Defendants are not and have never been eligible to be compensated for the Fraudulent Services.

6.     The charts annexed hereto as Exhibits "1" through "31" set forth the fraudulent claims identified to-date the Provider Defendants submitted or caused to be submitted to State Farm Mutual and State Farm Fire.

7.     The Defendants' fraudulent scheme began as early as 2017 and continues uninterrupted through the present.

8.     As a result of the Defendants' conduct, State Farm Mutual and State Farm Fire have incurred damages of more than $1,677,000.00.

## THE PARTIES

### I.     Plaintiffs

9.     State Farm Mutual and State Farm Fire are Illinois corporations with their principal places of business in Bloomington, Illinois. State Farm Mutual and State Farm Fire are authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

10.     Tandingan PT is a New York professional corporation with its principal place of business in New York.  Tandingan PT was incorporated in New York on or about May 15, 2017. Tandingan PT is purportedly owned by Tandingan, who, together with one or more of the Layperson Controllers, used Tandingan PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

11.     MT PT is a New York professional corporation with its principal place of business in New York.  MT PT was incorporated in New York on or about May 16, 2018. MT PT is purportedly owned by Tandingan, who, together with one or more of the Layperson Controllers, used MT PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

12.     Tandingan resides in and is a citizen of New York. Tandingan became licensed to practice physical therapy in New York on February 4, 2009, purports to be the owner of Tandingan PT and MT PT, and is listed on their bills as the "treating provider." In fact, Tandingan was merely the nominal owner of Tandingan PT and MT PT, did not personally perform the Fraudulent Services on their behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

13.     Chiropractic Diagnostic is a New York professional corporation with its principal place of business in New York.  Chiropractic Diagnostic was incorporated in New York on or about April 13, 2017. Chiropractic Diagnostic is purportedly owned by Pogildakov, who, together with one or more of the Layperson Controllers, used Chiropractic Diagnostic as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

14.     Pogildakov resides in and is a citizen of New York. Pogildakov became licensed to practice chiropractic in New York on March 6, 2009, purports to be the owner of Chiropractic Diagnostic, and is listed on its bills as the "treating provider." In fact, Pogildakov was merely the nominal owner of Chiropractic Diagnostic, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

15.     Dignity PT is a New York professional corporation with its principal place of business in New York.  Dignity PT was incorporated in New York on or about August 1, 2017. Dignity PT is purportedly owned by Magid, who, together with one or more of the Layperson Controllers, used Dignity PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

16.     MMA PT is a New York professional corporation with its principal place of business in New York.  MMA PT was incorporated in New York on or about October 25, 2017. MMA PT is purportedly owned by Magid, who, together with one or more of the Layperson Controllers, used MMA PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

17.     Magid resides in and is a citizen of New York. Magid became licensed to practice physical therapy in New York on February 23, 2015, purports to be the owner of Dignity PT and MMA PT, and is listed on their bills as the "treating provider." In fact, Magid was merely the nominal owner of Dignity PT and MMA PT, did not personally perform the Fraudulent Services on their behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

18.     Therapy Zone is a New York professional corporation with its principal place of business in New York.  Therapy Zone was incorporated in New York on or about October 6, 2017. Therapy Zone is purportedly owned by Abdelmohsen, who, together with one or more of the Layperson Controllers, used Therapy Zone as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

19.     Abdelmohsen resides in and is a citizen of New York. Abdelmohsen became licensed to practice physical therapy in New York on March 2, 2016, purports to be the owner of Therapy Zone, and is listed on its bills as the "treating provider." In fact, Abdelmohsen was merely the nominal owner of Therapy Zone, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

20.     Fialkov PC is a New York professional corporation with its principal place of business in New York.  Fialkov PC was incorporated in New York on or about August 9, 2017, Fialkov PC is purportedly owned by Fialkov, who, together with one or more of the Layperson Controllers, used Fialkov PC as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

21.     RF Chiropractic is a New York professional corporation with its principal place of business in New York.  RF Chiropractic was incorporated in New York on or about August 9, 2017. RF Chiropractic is purportedly owned by Fialkov, who, together with one or more of the Layperson Controllers, used RF Chiropractic as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

22.     Crosstown Chiropractic is a New York professional corporation with its principal place of business in New York.  Crosstown Chiropractic was incorporated in New York on or about June 5, 2019. Crosstown Chiropractic is purportedly owned by Fialkov, who, together with one or more of the Layperson Controllers, used Crosstown Chiropractic as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

23.     Fialkov resides in and is a citizen of New York. Fialkov became licensed to practice chiropractic in New York on May 28, 2014, purports to be the owner of Fialkov PC, RF Chiropractic, and Crosstown Chiropractic, and is listed on their bills as the "treating provider." In fact, Fialkov was merely the nominal owner of Fialkov PC, RF Chiropractic, and Crosstown Chiropractic, did not personally perform the Fraudulent Services on their behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

24.     McDonald Ave Chiropractic is a New York professional corporation with its principal place of business in New York.  McDonald Ave Chiropractic was incorporated in New York on or about April 27, 2018. McDonald Ave Chiropractic is purportedly owned by Bater, who, together with one or more of the Layperson Controllers, used McDonald Ave Chiropractic as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

25.     Bater resides in and is a citizen of New York. Bater became licensed to practice chiropractic in New York on August 23, 2002, purports to be the owner of McDonald Ave Chiropractic, and is listed on its bills as the "treating provider." In fact, Bater was merely the nominal owner of McDonald Ave Chiropractic, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

26.     Rehab Care is a New York professional corporation with its principal place of business in New York.  Rehab Care was incorporated in New York on or about May 4, 2016. Rehab Care is purportedly owned by Cabrera, who, together with one or more of the Layperson Controllers, used Rehab Care as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

27.     Cabrera resides in and is a citizen of New York. Cabrera became licensed to practice physical therapy in New York on December 1, 2009, purports to be the owner of Rehab Care, and is listed on its bills as the "treating provider." In fact, Cabrera was merely the nominal owner of Rehab Care, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

28.     Comfort PT is a New York professional corporation with its principal place of business in New York.  Comfort PT was incorporated in New York on or about April 11, 2011. Comfort PT is purportedly owned by Cadet who, together with one or more of the Layperson Controllers, used Comfort PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

29.     Cadet resides in and is a citizen of New York. Cadet became licensed to practice physical therapy in New York on July 10, 2007, purports to be the owner of Comfort PT, and is listed on its bills as the "treating provider." In fact, Cadet was merely the nominal owner of Comfort PT, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

30.     Atlas PT is a New York professional corporation with its principal place of business in New York.  Atlas PT was incorporated in New York on or about June 13, 2017. Atlas PT is purportedly owned by Awad, who, together with one or more of the Layperson Controllers, used Atlas PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

31.     Axis PT is a New York professional corporation with its principal place of business in New York.  Axis PT was incorporated in New York on or about July 15, 2019. Axis PT is purportedly owned by Awad, who, together with one or more of the Layperson Controllers, used Axis PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

32.     Awad resides in and is a citizen of New York. Awad became licensed to practice physical therapy in New York on May 13, 2015, purports to be the owner of Atlas PT and Axis PT, and is listed on their bills as the "treating provider." In fact, Awad was merely the nominal owner of Atlas PT and Axis PT, did not personally perform the Fraudulent Services on its behalf,

and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

33.     Elmwood Park is a New Jersey professional corporation with its principal place of business in New Jersey.  Elmwood Park was incorporated in New Jersey on or about October 1, 2018. Elmwood Park is purportedly owned by Sangavaram, who, together with one or more of the Layperson Controllers, used Elmwood Park as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

34.     Molnar Medical is a New Jersey professional corporation with its principal place of business in New Jersey.  Molnar Medical was incorporated in New Jersey on or about March 5, 2019. Molnar Medical is purportedly owned by Sangavaram, who, together with one or more of the Layperson Controllers, used Molnar Medical as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

35.     Sangavaram resides in and is a citizen of New Jersey. Sangavaram became licensed to practice medicine in New York on March 17, 1978, purports to be the owner of Elmwood Park and Molnar Medical, and is listed on their bills as the "treating provider." In fact, Sangavaram was merely the nominal owner of Elmwood Park and Molnar Medical, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

36.     Best Hands-On PT is a New York professional corporation with its principal place of business in New York.  Best Hands-On PT was incorporated in New York on or about April 9, 2009. Best Hands-On PT is purportedly owned by S. Yoo, who, together with one or more of the Layperson Controllers, used Best Hands-On PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

37.     S. Yoo resides in and is a citizen of New York. S. Yoo became licensed to practice physical therapy in New York on April 21, 2003, purports to be the owner of Best Hands-On PT, and is listed on its bills as the "treating provider." In fact, S. Yoo was merely the nominal owner of Best Hands-On PT, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

38.     Suarez Medical is a New York professional corporation with its principal place of business in New York.  Suarez Medical was incorporated in New York on or about August 23, 2012. Suarez Medical is purportedly owned by Suarez, who, together with one or more of the Layperson Controllers, used Suarez Medical as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

39.     Suarez resides in and is a citizen of New Jersey. Suarez became licensed to practice medicine in New York on September 7, 2007, purports to be the owner of Suarez Medical, and is listed on its bills as the "treating provider." In fact, Suarez was merely the nominal owner of Suarez Medical, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

40.     Heal-Rite PT is a New York professional corporation with its principal place of business in New York.  Heal-Rite PT was incorporated in New York on or about November 23, 2011. Heal-Rite PT is purportedly owned by Terekhov, who, together with one or more of the Layperson Controllers, used Heal-Rite PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

41.     Perloff PT PC is a New York professional corporation with its principal place of business in New York.  Perloff PT PC was incorporated in New York on or about March 25, 2019. Perloff PT PC is purportedly owned by Terekhov, who, together with one or more of the Layperson Controllers, used Perloff PT PC as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

42.     Terekhov resides in and is a citizen of New York. Terekhov became licensed to practice physical therapy in New York on September 22, 2011, purports to be the owner of Heal-Rite PT and Perloff PT PC, and is listed on their bills as the "treating provider." In fact, Terekhov was merely the nominal owner of Heal-Rite PT and Perloff PT PC, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

43.     Wellness PT is a New York professional corporation with its principal place of business in New York.  Wellness PT was incorporated in New York on or about February 6, 2015. Wellness PT is purportedly owned by Reyes, who, together with one or more of the Layperson Controllers, used Wellness PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

44.     Reyes resides in and is a citizen of New York. Reyes became licensed to practice physical therapy in New York on January 20, 2010, purports to be the owner of Wellness PT, and is listed on its bills as the "treating provider." In fact, Reyes was merely the nominal owner of Wellness PT, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

45.     Mill Medical is a New York professional corporation with its principal place of business in New York.  Mill Medical was incorporated in New York on or about June 24, 2016. Mill Medical is purportedly owned by Soman, who, together with one or more of the Layperson Controllers, used Mill Medical as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

46.     Soman resides in and is a citizen of New York. Soman became licensed to practice medicine in New York on June 24, 1999, purports to be the owner of Mill Medical, and is listed on its bills as the "treating provider." In fact, Soman was merely the nominal owner of Mill Medical, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

47.     MJG Medical is a New York professional corporation with its principal place of business in New York.  MJG Medical was incorporated in New York on or about March 22, 2019. MJG Medical is purportedly owned by Jean-Gilles, who, together with one or more of the Layperson Controllers, used MJG Medical as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

48.     Jean-Gilles resides in and is a citizen of New York. Jean-Gilles became licensed to practice medicine in New York on January 30, 1986, purports to be the owner of MJG Medical, and is listed on its bills and the bills submitted under his own name and tax identification number as the "treating provider." In fact, Jean-Gilles was merely the nominal owner of MJG Medical, did not personally perform the Fraudulent Services on its behalf or under his own name and tax identification number, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

49.     MC PT is a New York professional corporation with its principal place of business in New York.  MC PT was incorporated in New York on or about June 20, 2019. MC PT is purportedly owned by Cuadra, who, together with one or more of the Layperson Controllers, used MC PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

50.     Cuadra resides in and is a citizen of New York. Cuadra became licensed to practice physical therapy in New York on March 20, 2008, purports to be the owner of MC PT, and is listed on its bills as the "treating provider." In fact, Cuadra was merely the nominal owner of MC PT, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

51.     Inje PT is a New York professional corporation with its principal place of business in New York.  Inje PT was incorporated in New York on or about February 7, 2019. Inje PT is purportedly owned by Lee, who, together with one or more of the Layperson Controllers, used Inje PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

52.     Lee resides in and is a citizen of New York. Lee became licensed to practice physical therapy in New York on December 30, 2015, purports to be the owner of Inje PT, and is listed on its bills as the "treating provider." In fact, Lee was merely the nominal owner of Inje PT, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

53.     Better Hands PT is a New York professional corporation with its principal place of business in New York.  Better Hands PT was incorporated in New York on or about January 17 2017. Better Hands PT is purportedly owned by Parcon, who, together with one or more of the

Layperson Controllers, used Better Hands PT as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

54.     Parcon resides in and is a citizen of New York. Parcon became licensed to practice physical therapy in New York on December 13, 2005, purports to be the owner of Better Hands PT, and is listed on its bills as the "treating provider." In fact, Parcon was merely the nominal owner of Better Hands PT, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

55.     Inew Rehab is a New York professional corporation with its principal place of business in New York.  Inew Rehab was incorporated in New York on or about July 25, 2019. Inew Rehab is purportedly owned by H. Yoo, who, together with one or more of the Layperson Controllers, used Inew Rehab as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

56.     H. Yoo resides in and is a citizen of New York. H. Yoo became licensed to practice physical therapy in New York on September 14, 2015, purports to be the owner of Inew Rehab, and is listed on its bills as the "treating provider." In fact, H. Yoo was merely the nominal owner of Inew Rehab, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

57.     Pesidas PT PC is a New York professional corporation with its principal place of business in New York.  Pesidas PT PC was incorporated in New York on or about September 24, 2019. Pesidas PT PC is purportedly owned by Pesidas, who, together with one or more of the

Layperson Controllers, used Pesidas PT PC as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

58.     Pesidas resides in and is a citizen of New York. Pesidas became licensed to practice physical therapy in New York on January 11, 2010, purports to be the owner of Pesidas PT PC, and is listed on its bills as the "treating provider." In fact, Pesidas was merely the nominal owner of Pesidas PT PC, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

59.     LZ Medical is a New York professional corporation with its principal place of business in New York.  LZ Medical was incorporated in New York on or about December 24, 2019. LZ Medical is purportedly owned by Zarhin, who, together with one or more of the Layperson Controllers, used LZ Medical as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

60.     Zarhin resides in and is a citizen of New York. Zarhin became licensed to practice medicine in New York on May 16, 2006, purports to be the owner of LZ Medical, and is listed on its bills as the "treating provider." In fact, Zarhin was merely the nominal owner of LZ Medical, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use her name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

61.     GM Wellness is a New York professional corporation with its principal place of business in New York.  GM Wellness was incorporated in New York on or about August 22, 2017. GM Wellness is purportedly owned by Menczelesz, who, together with one or more of the

Layperson Controllers, used GM Wellness as a vehicle to submit fraudulent billing to State Farm Mutual and State Farm Fire.

62.     Menczelesz resides in and is a citizen of New York. Menczelesz became licensed to practice medicine in New York on May 26, 1998, purports to be the owner of GM Wellness, and is listed on its bills as the "treating provider." In fact, Menczelesz was merely the nominal owner of GM Wellness, did not personally perform the Fraudulent Services on its behalf, and allowed one or more of the Layperson Controllers to use his name and license to submit fraudulent billing to State Farm Mutual and State Farm Fire.

63.     Sattarov resides in and is a citizen of New York. Sattarov has never been a licensed healthcare professional, yet he, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Sattarov is also the owner of Showtime Transportation, which he used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

64.     In fact, Sattarov was recently criminally indicted on charges relating to money laundering and bank fraud.  See United States v. Sattarov, Docket No. 1:20-cr-00653 (S.D.N.Y. 2020). Upon information and belief, the money laundering and bank fraud scheme underlying the federal criminal indictment against Sattarov concern many of the same transactions that underlie the no-fault insurance fraud scheme alleged herein.

65.     Rahmatov resides in and is a citizen of New York. Rahmatov has never been a licensed healthcare professional, yet he, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Rahmatov is also the owner of Show Trans and JNMT, which he used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

66.    Geykhman resides in and is a citizen of New York. Geykhman has never been a licensed healthcare professional, yet he, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Geykhman is also the owner of All City Cars, which he used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

67.    In fact, Geykhman recently pled guilty to one Count of Conspiracy to Commit Healthcare Fraud in connection with submission of no-fault insurance claims for diagnostic testing that was never performed.  See United States v. Geykhman, Docket No. 1:20-cr-00371 (E.D.N.Y. 2020).  Upon information and belief, the criminal conspiracy to which Geykhman pled guilty is at the heart of the no-fault insurance scheme alleged herein.

68.    Djafarov resides in and is a citizen of New York. Djafarov has never been a licensed healthcare professional, yet he, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Djafarov also assisted in the operation of All City Cars in order to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

69.    Djafarov previously pled guilty and was sentenced to 10 months' imprisonment for Conspiracy to Commit Healthcare Fraud in connection with his control of a New York no-fault clinic.  See United States v. Katz, et al., Docket No. 1:12-cr-00884 (S.D.N.Y. 2012).

70.    Kozyreva resides in and is a citizen of New York. Kozyreva has never been a licensed healthcare professional, yet she, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Kozyreva also assisted in the operation of All City Cars in order to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

71.     Sheynkman resides in and is a citizen of New York. Sheynkman has never been a licensed healthcare professional, yet he, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law.

72.     Pyetrosyan resides in and is a citizen of New York. Pyetrosyan has never been a licensed healthcare professional, yet she, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Pyetrosyan is also the owner of BPNT, which she used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

73.     Tasheva resides in and is a citizen of New York. Tasheva has never been a licensed healthcare professional, yet she, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Tasheva is also the owner of 1001 NY, which she used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

74.     Burlak resides in and is a citizen of New York. Burlak has never been a licensed healthcare professional, yet she, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Burlak is also the owner of JNBJ, which she used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

75.     Khakimova resides in and is a citizen of New York. Khakimova has never been a licensed healthcare professional, yet she, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New

York Law. Khakimova is also the owner of MNDNT, which she used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

76.     Kuliev resides in and is a citizen of New York. Kuliev has never been a licensed healthcare professional, yet he, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Kuliev is also the owner of Showtime II, which she used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

77.     Bakoeva resides in and is a citizen of New York. Bakoeva has never been a licensed healthcare professional, yet she, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Bakoeva is also the owner of STGG, which she used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

78.     Agamirzayeva resides in and is a citizen of New York. Agamirzayeva has never been a licensed healthcare professional, yet she, together with the other Layperson Controllers, owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York Law. Agamirzayeva is also the owner of RTNM, which she used to siphon the profits of the Provider Defendants and to launder the proceeds of the fraudulent scheme.

79.     Showtime Transportation is a New York corporation that was incorporated on May 5, 2014 with its principal place of business in New York.  Showtime Transportation is owned and controlled by Sattarov.

80.     Show Trans is a New York corporation that was incorporated on April 26, 2018 with its principal place of business in New York.  Show Trans is owned and controlled by Rahmatov.

81.     BPNT is a New York corporation that was incorporated on June 2, 2017 with its principal place of business in New York.  BPNT is owned and controlled by Pyetrosyan.

82.     1001 NY is a New York corporation that was incorporated on February 20, 2018 with its principal place of business in New York.  1001 NY is owned and controlled by Tasheva.

83.     JNBJ is a New York corporation that was incorporated on April 12, 2018 with its principal place of business in New York.  JNBJ is owned and controlled by Burlak.

84.     JNMT is a New York corporation that was incorporated on December 28, 2015 with its principal place of business in New York.  JNMT is owned and controlled by Rahmatov.

85.     MNDNT is a New York corporation that was incorporated on February 20, 2018 with its principal place of business in New York.  MNDNT is owned and controlled by Khakimova.

86.     Showtime II is a New York corporation that was incorporated on November 14, 2016 with its principal place of business in New York.  Showtime II is owned and controlled by Kuliev.

87.     STGG is a New York corporation that was incorporated on June 6, 2018 with its principal place of business in New York.  STGG is owned and controlled by Bakoeva.

88.     RTNM is a New York corporation that was incorporated on June 14, 2018 with its principal place of business in New York.  RTNM is owned and controlled by Agamirzayeva.

89.     All City Cars is a New York corporation that was incorporated on May 8, 2015 with its principal place of business in New York.  All City Cars is owned and controlled by Geykhman.

90.     Vasilevsky resides in and is a citizen of New Jersey. Vasilevsky has never been a licensed healthcare professional, yet conspired with the Layperson Controllers and knowingly aided and abetted the fraudulent scheme by, among other things, fraudulently cashing many of the

Provider Defendants' checks (whether written to or from them) at check cashing facilities and then submitting false W-9 forms to the check cashing facilities.

91.     Vasilevsky was previously found guilty of bank fraud, conspiracy to commit bank fraud, transportation of stolen bank checks, and conspiracy to transport stolen bank checks and was sentenced to 24 months' imprisonment.  See United States v. Vasilevsky, et al., Docket No. 1:08-cr-00903 (S.D.N.Y. 2008).

92.     Kozachkov resides in and is a citizen of New York. Kozachkov has never been a licensed healthcare professional, yet conspired with the Layperson Controllers and knowingly aided and abetted the fraudulent scheme by, among other things, fraudulently cashing many of the Provider Defendants' checks (whether written to or from them) at check cashing facilities and then submitting false W-9 forms to the check cashing facilities.

93.     Zaretser resides in and is a citizen of New York.  Zaretser has never been a licensed healthcare professional, yet conspired with the Layperson Controllers and knowingly aided and abetted the fraudulent scheme by, among other things, performing billing services on behalf of several of the Provider Defendants and distributed their insurance payments to the Layperson Controllers and/or Check Cashers, even though she knew that one or more of the Layperson Controllers controlled the respective Provider Defendants;

94.     John Doe Defendants 1-10 reside in and are citizens of New York. John Doe Defendants 1-10 are individuals and entities, presently not identifiable, who are not and never have been licensed as physicians or healthcare professionals, yet have owned and/or controlled the operation and management of the Provider Defendants' healthcare practices, or conspired with the Layperson Defendants and knowingly aided and abetted the fraudulent scheme by providing

services on behalf of the Provider Defendants that enabled them to collect no-fault benefits, even though they knew that the Provider Defendants were not entitled to such benefits.

## JURISDICTION AND VENUE

95.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. because they arise under the laws of the United States.

96.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

97.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

98.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside(s) and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.     **An Overview of the No-Fault Laws and Licensing Requirements**

99.     State Farm Mutual and State Farm Fire underwrite automobile insurance in New York.

100.     New York's No-Fault laws are designed to ensure injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)

(collectively, the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

101.    No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses incurred for health care goods and services.

102.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to an executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

103.    Under the No-Fault Laws, healthcare providers are not eligible to bill for or collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

104.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

(emphasis added).

105.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that, under the No-Fault Laws and their implementing

regulations, healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits.

106.     In <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

107.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.

108.     Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

109.     Therefore, under the No-Fault Laws, a healthcare provider violates material licensing laws and is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, or if it engages in unlawful fee-splitting with unlicensed non-professionals.

110.     In addition, New York law prohibits licensed healthcare providers from directly or indirectly offering, giving, soliciting, receiving, or agreeing to receive any money or other form of consideration from a third party in relation to patient referrals or the performance of professional services.  <u>See</u>, <u>e.g.</u>, New York Education Law § 6530(18) and 8 N.Y.C.R.R. § 29.1(b)(3).

111.     Under New York Education Law § 6530(19), it is also unlawful for a medical professional to share fees for professional services, which includes arrangements or agreements whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice.

112.     Therefore, under New York Law, a healthcare provider violates material licensing laws and is ineligible to receive No-Fault Benefits if it is directly or indirectly involved in financial relationships with third parties that relate to patient referrals or the performance of professional services.

113.     Further, pursuant to the No-Fault Laws, only healthcare providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than patients or their healthcare providers. The implementing regulation adopted by the Superintendent of Insurance states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss . . . directly to the applicant or . . . upon assignment by the applicant . . . shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law . . . .

11 N.Y.C.R.R. § 65-3.11 (emphasis added).

114.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a healthcare provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare provider, such as independent contractors.

115.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

116.    When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

117.    Finally, under Section 403 of the New York State Insurance Law, all NF-3s and HCFA-1500 forms submitted by a healthcare provider to State Farm Mutual and State Farm Fire, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

118.    Beginning in 2017 and continuing through the present, the Defendants have engaged in a fraudulent scheme in order to submit inflated charges to State Farm Mutual and State Farm Fire for medically unnecessary healthcare services.

119.    At its core, the Defendants' fraudulent scheme worked as follows:

- The Layperson Controllers were responsible for recruiting the Nominal Owners and Provider Defendants;

- In exchange for the promise of financial gain, the Nominal Owners and Provider Defendants allowed the Layperson Controllers to use their healthcare licenses in

order to create the false appearance that the Fraudulent Services were legitimate, performed and/or supervised by a licensed healthcare professional, and medically necessary;

- The Layperson Controllers entered into illegal kickback and referral arrangements with the owners and controllers of more than one-hundred and fifteen (115) New York multi-disciplinary clinics (the "No-Fault Clinics") that catered almost exclusively to no-fault patients in order to obtain access to the No-Fault Clinics' patients;

- At the direction of the Layperson Controllers, most of the Nominal Owners opened bank accounts under their respective Provider Defendants' names for the purpose of receiving no-fault insurance payments and then immediately ceded control of the bank account to the Layperson Controllers;

- At the direction of the Layperson Controllers, many of the Nominal Owners provided a signature stamp to the Layperson Controllers so that the Layperson Controllers could use the stamp on the diagnostic testing reports generated by the independent contractor technicians and on the checks written from the Provider Defendants' bank accounts in order to create the false appearance that the Nominal Owners were personally writing checks from their respective Provider Defendants' bank accounts and personally rendering the Fraudulent Services at the No-Fault Clinics;

- At the direction of the Layperson Controllers, many of the Nominal Owners opened and maintained mailboxes under the Provider Defendants' names at private shipping facilities located near the Layperson Controllers' residences and gave the Layperson Controllers and others access to that mailbox. The Layperson Controllers then directed that those mailboxes be listed as the Provider Defendants' billing addresses so they could directly retrieve the Provider Defendants' mail, including no-fault insurance payments. Those Provider Defendants that did not maintain such mailboxes either used an attorneys' office or a post office box controlled by Zaretser as their billing address for receipt of no-fault insurance payments;

- Several of the Nominal Owners, on behalf of the Provider Defendants, hired attorneys chosen at the direction of the Layperson Controllers. With respect to those Provider Defendants who used an attorney's office as their billing address, the respective Nominal Owners signed legal documents enabling the Provider Defendants' insurance payments received by the attorney's office to be deposited into the attorney's bank account and transferred according to the directives of the Layperson Controllers;

- The Layperson Controllers hired independent contractor technicians to perform the Fraudulent Services under the Nominal Owners' and Provider Defendants' names;

- The Layperson Controllers hired Zaretser and others to prepare and generate many of the Provider Defendants' bills for the Fraudulent Services, to submit those bills to State Farm Mutual and State Farm Fire, and to distribute several of the Provider Defendants' insurance payments according to their directives;

- The Layperson Controllers operated the Provider Defendants as a series of successors to one another whereby one or more Provider Defendants ceased performing the Fraudulent Services at the No-Fault Clinics around the time that one or more new Provider Defendants began performing the Fraudulent Services in place of their predecessors at the same No-Fault Clinics;

- At the direction of the Layperson Controllers, each of the Provider Defendants, with Nominal Owners who have no apparent relationship to one another, performed the Fraudulent Services for only a few months before ceasing to render services so that a new Provider Defendant could take its place in the fraudulent scheme. This was ostensibly done to conceal the fact that the Layperson Controllers were the true owners of each of the Provider Defendants and to evade investigations by no-fault insurers, including State Farm Mutual and State Farm Fire;

- The Layperson Controllers established, implemented, directed, and oversaw the provision of the fraudulent, pre-determined billing and treatment protocols of the Provider Defendants, which were designed to maximize the Defendants' profits without regard to patient care;

- The Layperson Controllers, through the Provider Defendants, chose billing codes for the Fraudulent Services that misrepresented and/or exaggerated the level of services provided to Insureds in order to inflate and/or unbundle the charges submitted to State Farm Mutual and State Farm Fire, which maximized the Defendants' profits; and

- Once no-fault insurance payments were received by the Layperson Controllers, they engaged in a complex financial scheme that resulted in the vast majority of payments being divided in at least one of four different ways in order to dilute the total amount of money they received: (i) laundered via checks written from many of the Provider Defendants' bank accounts to the Transportation Corporations; (ii) diverted to a patient broker via checks written from many of the Provider Defendants' bank accounts to various shell companies, which in turn converted the payments into cash; (iii) converted into cash directly by the Check Cashers, instead of being first deposited into the Provider Defendants' bank accounts; and/or (iv) converted into cash indirectly via checks written from many of the Provider Defendants' bank accounts to ostensibly legitimate companies, but which checks were instead given to the Check Cashers to convert to cash.

**A.    The Layperson Controllers' Fraudulent Control and Operation of the Provider Defendants' Healthcare Practices**

1. **The Layperson Controllers Controlled the Provider Defendants and Used the Professional Licenses of the Nominal Owners to Siphon Profits**

120.    The Layperson Controllers were responsible for recruiting the Nominal Owners and Provider Defendants into the fraudulent scheme.

121.    To circumvent New York law, the Layperson Controllers entered into arrangements with the Nominal Owners whereby the Nominal Owners incorporated professional corporations at the Layperson Controllers' direction or ceded control of an existing professional corporation to the Layperson Controllers.  The Nominal Owners did so in exchange for the promise of some financial gain, a designated salary, or other form of compensation.  To induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing the Provider Defendants to operate healthcare practices and/or to maintain the facially validity of such certificate of authority, the Nominal Owners agreed to falsely represent in the certificates of incorporation filed with the Education Department and/or to represent in the triennial statements filed thereafter, that they were the true shareholder, director, and officer of their respective Provider Defendants and that they each truly owned and controlled their respective professional corporations.

122.    Once each Nominal Owner either unlawfully incorporated a respective Provider Defendant or provided the necessary information for the Layperson Controllers to operate and control an existing Provider Defendant professional corporation and/or healthcare practice, the Nominal Owners ceded true beneficial ownership and control over their respective professional corporations and healthcare practices to the Layperson Controllers.

123.    The Nominal Owners: (i) did not provide any startup capital or incur any costs to establish the Provider Defendants as providers of the Fraudulent Services; and (ii) did not market their practices to the general public, did not advertise for patients, did not engage in efforts to attract

new referral sources, did not seek to build name recognition to draw legitimate business, and did virtually nothing as would be expected of the owner of a legitimate healthcare "practice" to develop their reputations and attract patients. Rather, the Provider Defendants instantly began operating at dozens of No-Fault Clinics in the New York City area in successive fashion.

124.    Further, the Nominal Owners and Provider Defendants allowed the Layperson Controllers to use their healthcare licenses in order to create the false appearance that the Fraudulent Services were legitimate, performed and/or supervised by a licensed healthcare professional, and medically necessary. Indeed, contrary to the representations in the Provider Defendants' bills, none of the Nominal Owners rendered the Fraudulent Services. Nor did the Nominal Owners supervise the independent contractor technicians who actually did perform the Fraudulent Services.

125.    At the direction of the Layperson Controllers, most of the Nominal Owners opened bank accounts under their respective Provider Defendants' names for the purpose of receiving no-fault insurance payments and then immediately ceded control of the bank accounts to the Layperson Controllers.

126.    In that regard, State Farm Mutual and State Farm Fire interviewed Andre Duhamel, M.D. ("Duhamel"), the nominal owner of a professional corporation, Ditmas Primary Medical Care, P.C. ("Ditmas"), which, while not named as Defendants herein, operated as part of the chain of successive transient diagnostic providers prior to Defendant Tandingan PT rendering the Fraudulent Services. Tandingan PT was the first of the Provider Defendants to operate in the chain of successive transient providers in the scheme detailed in this Complaint.

127.    During the interview, Duhamel indicated, among other things: (i) laypersons had controlled the performance of the Fraudulent Services billed under his name and social security

number and through Ditmas; (ii) he opened a bank account for Ditmas with the aid and at the direction of individuals in charge of the scheme, and ceded control of that bank account to those individuals; (iii) he never wrote any checks from Ditmas' bank account; (iv) the individuals in charge directed him to meet with an attorney in furtherance of the fraudulent scheme; and (v) he never personally performed any of the Fraudulent Services, nor was he physically present as a treating provider in any of the total of thirty-four (34) No-Fault Clinics from which Fraudulent Services were rendered under his and Ditmas' name.

128.    Similarly, State Farm Mutual and State Farm Fire interviewed Hamid I. Lalani, M.D. ("Lalani"), another physician not named as a Defendant herein but under whose name and tax identification number PfNCS testing was performed as part of the chain of Provider Defendants in the fraudulent scheme.

129.    Lalani advised State Farm Mutual and State Farm Fire, among other things, that: (i) Sheynkman offered Lalani a business opportunity to set up a diagnostic testing healthcare practice and promised that "everything would be kosher"; (ii) he went to a bank with Sheynkman to open a bank account to receive the proceeds of the fraudulent scheme and ceded control of that bank account to Sheynkman; (iii) Sheynkman introduced him to an attorney whom Sheynkman stated would ensure "everything would be kosher"; (iv) Lalani had at least one in-person meeting with both the attorney and Sheynkman present where the details of Lalani's role operating a transient PfNCS provider were discussed, including that Lalani would not be seeing patients personally and would simply be signing PfNCS testing reports handed to him by Sheynkman; (v) Sheynkman and the attorney had Lalani sign legal paperwork in order to facilitate Sheynkman's control of Lalani's healthcare practice, to use a funding company of Sheynkman's and the attorney's choosing (which was then used by other Provider Defendants, including, but not limited

to, McDonald Ave Chiropractic and RF Chiropractic), to use the attorney's office as his billing address, and allow for the resulting insurance payments to be deposited directly into the attorney's bank account; (vi) Sheynkman and others associated with Sheynkman wrote the checks from Lalani's bank account, which Lalani signed at Sheynkman's direction; and (vii) Lalani never personally performed any of the Fraudulent Services, nor was he physically present as a treating provider in any of the twenty-two (22) No-Fault Clinics from which Fraudulent Services were rendered under his name.

130.     In addition to Lalani, the Layperson Controllers caused several of the Provider Defendants, including McDonald Ave Chiropractic, RF Chiropractic, Jean-Gilles, Mill Medical, Crosstown Chiropractic, and GM Wellness, to use the same attorney's office as the billing address of those Provider Defendants, allowing insurance payments, including those from State Farm Mutual and State Farm Fire, to be directly deposited in the attorney's bank account so they could then be transferred according to the Layperson Controllers' directives.

131.     The Layperson Controllers secured control over the bank accounts of the Provider Defendants to cause the Provider Defendants to issue checks to: (i) entities associated with patient brokers, such as Igor Dovman ("Dovman") and Mikhail Struzberg ("Struzberg"); (ii) one or more of the Transportation Corporations; (iii) the same companies associated with independent contractor technicians who were apparently used by the Provider Defendants to perform the Fraudulent Services; and/or (iv) to be cashed by the Check Cashers.

132.     In conjunction with the Layperson Controllers directing the profits of the Provider Defendants to themselves and others as part of the Fraudulent Scheme, and the Nominal Owners selling their licenses to be used by the Layperson Controllers, Duhamel, Lalani, and the Nominal Owners rarely, if ever, received any money from the Provider Defendant bank accounts.

133.    For example: (i) Abdelmohsen, Fialkov, and Bater did not receive any direct payments from their respective Provider Defendant's bank accounts; (ii) Magid received approximately $4,000.00 even though his Provider Defendants issued checks in excess of $2,500,000.00 from their accounts; and (iii) Cadet received approximately $5,000.00 even though her Provider Defendant issued checks in excess of $1,400,000.00 from its account.

a.    Payments to the Transportation Corporations

134.    As part of the Layperson Controllers' fraudulent scheme, Ditmas and many other medical providers controlled by the Layperson Controllers were required to make payments to individuals and entities associated with several of the Layperson Controllers, including direct payments to JNMT, Showtime II, a corporation owned by Zaretser, and an entity A&Y Royal Insurance Co. ("A&Y Royal"), which appears to be an insurance broker.

135.    Notably, the payments to A&Y Royal appeared to have been made for the purpose of paying automobile insurance policies maintained on vehicles by Defendant Showtime Transportation, its owner Sattarov, and the family of Transportation Corporations and owners closely associated with Showtime Transportation and Sattarov, including the other Defendant Transportation Corporations and their owners, except for All City Cars and its owner Geykhman (which, like Showtime Transportation, obtained automobile insurance policies from A&Y Royal via payments from healthcare professional corporations).

136.    In fact, the Transportation Corporations, despite being owned by separate individuals are primarily controlled by Sattarov and Rahmatov.  For example, upon information and belief, Rahmatov's relatives are the listed owners of 1001 NY and MNDNT.  Similarly, it is believed that friends and associates of Sattarov were used to incorporate BPNT, JNBJ, Showtime II, STGG and RTNM.  Despite being nominally owned by others and their respective nominal owners having

opened and served as signatories on their bank accounts, the Transportation Corporations' operations and finances appear to be controlled by Sattarov (in addition to the ones he nominally owns).

137.    The Layperson Controllers used Ditmas' bank account and those of many Provider Defendants to simultaneously launder and benefit from the proceeds of the fraudulent scheme by using the proceeds to make direct payments to the Transportation Corporations under the guise of receiving legitimate services and to an insurance broker for purported automobile insurance policies regarding vehicles owned by the Transportation Corporations.

138.    Once the Layperson Controllers ceased having Ditmas operate, they caused another entity, BSS Medical, P.C. ("BSS Medical") (not named as a Defendant herein) to perform services at almost all of the same No-Fault Clinics, in order for them to continue to siphon profits.  The Layperson Controllers caused BSS Medical to make the same payments to entities associated with the Layperson Controllers, including direct payments to JNMT, Showtime II, an entity associated with Djarfarov and Kozyreva, and, again, A&Y Royal.

139.    Thereafter, the Layperson Controllers caused BSS Medical to cease performing Fraudulent Services and caused Tandingan PT to immediately begin performing Fraudulent Services in its place at almost all of the same No-Fault Clinics. As with Ditmas and BSS, the Layperson Controllers caused Tandingan PT to make payments to entities associated with the Layperson Controllers, including direct payments to entities associated with Djarfarov and Kozyreva, and, yet again, A&Y Royal.

140.    This time, the check from Tandingan PT to A&Y Royal paid for automobile insurance policies held by All City Cars, but still served to launder the proceeds of the fraudulent scheme.   Thereafter, many of the Provider Defendants continually made payments to the

Transportation Corporations at the direction of the Layperson Controllers for the purpose of laundering the proceeds of the fraudulent scheme and to enrich the Layperson Controllers.

141.    State Farm Mutual and State Farm Fire obtained financial records from many of the Provider Defendants which show that among those Provider Defendants, they paid the Transportation Corporations in excess of $1,700,000.00 from those Provider Defendants' bank accounts alone in less than two years.

142.    The payments to the Transportation Corporations by many of the Provider Defendants cannot be for legitimate purposes or services, nor is there any evidence to suggest the Transportation Corporations ever provided any legitimate services to the Provider Defendants or Nominal Owners.

143.    As the Provider Defendants were transient and received all of their patients from No-Fault Clinics, there was no legitimate reason for the Provider Defendants to pay for purported legitimate services of the Transportation Corporations, as the patients were already receiving services at the No-Fault Clinics.

144.    Rather, these payments were made at the direction of the Layperson Controllers in order to siphon profits from the Provider Defendants they controlled and use those profits for personal gain.

b.    The Layperson Controllers' Check Cashing Scheme

145.    In addition to the direct payments to the Transportation Corporations and the payments to patient brokers, the Layperson Controllers, using many of the Provider Defendants' bank accounts, used the Check Cashers to present checks written to/from the Provider Defendants' accounts and false W-9s to: (i) launder the proceeds of the fraudulent scheme and conceal its true owners; and (ii) provide cash to the patient brokers in order to obtain patients.

146.    In keeping with the fact that the Layperson Controllers operated the Provider Defendants' healthcare practices, as opposed to their Nominal Owners, many of the insurance payments made by State Farm Mutual and State Farm Fire to the Defendants were cashed at a specific check cashing location in New Jersey by the Check Cashers.

147.    Despite the Provider Defendants having no relationship on paper, the Nominal Owners living largely in New York City, and the fact that the Fraudulent Services were provided solely in New York, many of the Provider Defendants used the same check cashing facility in Clifton, New Jersey to cash: (i) insurance checks received as reimbursement for the Fraudulent Services; and/or (ii) checks written from the Provider Defendants' accounts to others. In actuality, these checks were being cashed at the Layperson Controllers' direction by the Check Cashers in an effort to hide that the Provider Defendants were controlled by unlicensed individuals, to generally conceal the Layperson Controllers' identities, and to make the funds untraceable. In fact, Vasilevsky advised State Farm Mutual and State Farm Fire that he received the Provider Defendants' checks from "Arthur" and "Vladimir" at the office building where All City Cars maintained an office.

148.    The Layperson Controllers spread out billing for the Fraudulent Services among many different entities and tax identification numbers to evade detection from State Farm Mutual and State Farm Fire (and likely other insurance companies) and maximize the amount of no-fault insurance payments they would receive from the scheme.

149.    The amount of insurance proceeds paid to the Provider Defendants from the fraudulent scheme that was directly or indirectly converted into cash at the direction of the Layperson Controllers based on financial records obtained by State Farm Mutual and State Farm Fire is in excess of at least $4,500,000.00 over approximately a two-year period.

150.    Part of the check cashing portion of the fraudulent scheme entailed cashing insurance checks directly with check cashers, ostensibly to make the funds instantly untraceable and prevent such funds from entering the Provider Defendants' bank accounts in order to conceal the true amount of their income.  This was done for Provider Defendants that had their insurance checks mailed to P.O. Boxes controlled by the Layperson Controllers as well as Zaretser.  For example, Defendants Heal-Rite PT, Axis PT, Atlas PT, Best Hands-On PT, and MMA PT all had no-fault insurance payments from State Farm Mutual and State Farm Fire cashed at check cashing facilities in New Jersey.

151.    In addition, Defendants MMA PT and its owner Magid are named defendants in a federal litigation captioned Petroff Amshen LLP v. Alfa Rehab PT PC, et. al., 19-cv-01861 (E.D.N.Y. 2019). In that matter, Petroff Amshen LLP alleges that, as part of a money laundering and fraudulent scheme, MMA PT, Magid, and others, generated, issued, and signed checks made payable to Petroff Amshen LLP, unbeknownst to them, for legal services that were never rendered. It is further alleged that MMA PT, Magid, and others distributed the checks, fraudulently endorsed them by forging Petroff Amshen LLP's signature, and caused them to be presented to a check casher in New Jersey where each check was converted to cash, which was also an integral part of the fraudulent scheme alleged herein.

152.    In reality, the Layperson Controllers and/or others on their behalf wrote the MMA PT checks to Petroff Amshen LLP without ever intending that they reach Petroff Amshen LLP. Instead, the Layperson Controllers provided such checks and others like them to the Check Cashers along with false W-9 forms so that the Check Cashers could turn the fraudulent gained insurance proceeds into untraceable cash to be further funneled according to the directives of the Layperson

Controllers. Indeed, this was true of virtually all the checks written from the Provider Defendants' bank that were ultimately cashed at a check cashing facility.

2. The Provider Defendants were Operated by the Layperson Controllers as Successor Healthcare Practices

153.    The Layperson Controllers operated the Provider Defendants as successor entities, meaning that, when one or more of the Provider Defendants ceased operating, new Provider Defendants began performing the Fraudulent Services in place of their predecessors. This method of operation allowed Defendants to submit billing through a web of seemingly unrelated professional corporations and healthcare professionals, while simultaneously maximizing the amount of profit that the Layperson Controllers could realize from the fraudulent scheme and making their scheme more difficult for State Farm Fire and State Farm Mutual (and likely other insurance companies) to detect.

154.    By way of example, although not exhaustive, Tandingan PT ceased performing the ROM/MT on Friday, July 14, 2017.  Dignity PT began performing ROM/MT at largely the same No-Fault Clinics as Tandingan PT on Monday, July 17, 2017.  By way of further example, the PfNCS testing performed under Lalani's name ceased on February 6, 2019.  Jean-Gilles and Mill Medical began performing PfNCS testing at many of the same No-Fault Clinics as Lalani on February 11, 2019 and February 13, 2019, respectively.

155.    This kind of immediate turnover was true for the Provider Defendants in the fraudulent scheme and done in order to receive insurance payments before insurance companies could meaningfully investigate the Provider Defendants' claim submissions, spread out billing for the Fraudulent Services among many different entities and tax identification numbers to evade detection, and maximize the amount of no-fault insurance payments they would receive from the scheme.

### 3. The Defendants' Use of Signature Stamps

156. In keeping with the fact that the Layperson Controllers and not the Nominal Owners owned and/or controlled the Provider Defendants, the Layperson Controllers routinely caused medical reports and bills submitted to State Farm Mutual or State Farm Fire to be: (i) stamped with a signature stamp of the pertinent provider's signature; and (ii) signed with a typed statement that said "signature on file."  The stamped signatures and "signature on file" statements were used to falsely represent and create the appearance that the purported owner and/or healthcare provider played a role in the performance of the Fraudulent Services and actually reviewed the medical reports and/or bills prior to their submission, when, in fact, they did not.

157. Additionally, the Layperson Controllers used the signature stamps, with the consent of many of the Nominal Owners, to conceal the true providers of the Fraudulent Services. Though each Nominal Owner is listed on its respective Provider Defendants' bills as the "treating provider," the Fraudulent Services were actually provided by independent contractors, not the Nominal Owners.

158. Zaretser, as the purported owner of the billing companies used by many of the Provider Defendants, was aware of the improper ownership of the entities, routinely did not have direct communications with the Nominal Owners and prepared, generated, and mailed the billing and medical documentation that contained the signature stamps, improper billing codes, and charges listing the Nominal Owner as the "treating provider," even though the services were performed by independent contractor technicians.

### 4. The Provider Defendants' Use of Private Mailboxes as Billing Addresses

159. Keeping with the fact that the Layperson Controllers controlled the Provider Defendants, the Layperson Controllers and/or the Nominal Owners at the Layperson Controllers'

direction rented private mailboxes to be used as billing addresses for many of the Provider Defendants, including Wellness PT, MC PT, McDonald Ave Chiropractic, Therapy Zone, Rehab Care, Better Hands PT, Chiropractic Diagnostic, MMA PT, Dignity PT, Suarez Medical, MJG Medical, Perloff PT PC, Pesidas PT PC, Fialkov PC, RF Chiropractic, GM Wellness, and Comfort PT. The Layperson Controllers then caused those Provider Defendants to submit billing to State Farm Mutual and State Farm Fire that created the false impression that these mailboxes were legitimate places of business by, among other things, misrepresenting the pertinent mailbox number as a "suite" number or by using the symbol "#" before the mailbox number.

160.    For example, Therapy Zone and Rehab Care listed their billing address on their bills submitted to State Farm Mutual and State Farm Fire as 2167 East 21st Street, Brooklyn, New York 11235 at "Suite 249" and "Suite 253," respectively. In reality, Therapy Zone and Rehab Care maintained no physical presence at that address, as that location is a store called "Mailboxes of Brooklyn," and "Suite 249" and "Suite 253" are references to a mailbox number at the location.

161.    Likewise, Dignity PT, MMA PT, Suarez Medical, MJG Medical, and Perloff PT PC listed their billing address on bills submitted to State Farm Mutual and State Farm Fire as 2896 Shell Road, Brooklyn, New York 11224 at "#7," "#26," "Suite 61," "Suite 72," and "Suite 73," respectively. In reality, Dignity PT, MMA PT, Suarez Medical, MJG Medical, and Perloff PT PC maintained no physical presence at this address, as that location is a private shipping facility called "Nacha Pochta," and "#7," "#26," "Suite 61," "Suite 72," and "Suite 73," are references to mailbox numbers at the location.

162.    Similarly, several of the Provider Defendants, including but not limited to Heal-Rite PT PC, Inew Rehab, and Axis PT, listed their billing address for the Fraudulent Services as a post-office box maintained by Zaretser.

163.    Keeping with the fact that the Layperson Controllers, not the Nominal Owners, were the ones controlling and accessing the mailboxes on a regular basis, the mailboxes were not proximally located to the primary residences where the Nominal Owners resided.

**B.      The Illegal kickback and Referral Arrangements**

164.    The Provider Defendants were "transient" providers that maintained no fixed treatment locations; never maintained stand-alone practices; had no internet website; did not otherwise advertise or market their services to the general public; were not the owners or leaseholders of the real property from which they purported to provide the Fraudulent Services; and indeed, provided no legitimate or medically necessary services.

1.      The "Pay-to-Play" Kickback Arrangements

165.    First, despite failing to market their services or bring patients over from any prior practice, the Provider Defendants each had a steady flow of patients the moment they began rendering the Fraudulent Services due to illegal kickback and referral arrangements the Defendants entered into with the healthcare providers and/or clinic controllers at each No-Fault Clinic location.

166.    Because the healthcare practices of the Provider Defendants were operated by the Layperson Controllers, the illegal kickback and referral arrangements provided the Defendants with a shared pool of No-Fault Clinics from which to receive patient referrals. As a result, almost all of the No-Fault Clinic locations at which the Defendants rendered the Fraudulent Services were shared with at least one of the other healthcare providers in the scheme, but routinely shared by numerous Provider Defendants in successive fashion.

167.    As a result of the illegal kickback and referral arrangements, the Defendants allegedly provided Fraudulent Services from a total of at least 115 different No-Fault Clinic locations over approximately three years—100 of which were shared by at least one other Provider Defendant

during that time period. Indeed, demonstrating both the longevity and consistency of the fraudulent

scheme, the following 33 No-Fault Clinics were shared by 10 or more of the Provider Defendants

over the course of scheme, with one location, 3910 Church Avenue, Brooklyn, New York, having

been shared by a total of 19 Provider Defendants:

     (i)     3910 Church Avenue, Brooklyn, New York;

     (ii)     105-10 Flatlands Avenue, Brooklyn, New York;

     (iii)     107-48 Guy Brewer Boulevard, Jamaica, New York;

     (iv)     1120 Morris Park Avenue, Bronx, New York;

     (v)     14 Bruckner Boulevard, Bronx, New York;

     (vi)     152-80 Rockaway Boulevard, Jamaica, New York;

     (vii)     175 Fulton Avenue, Hempstead, New York;

     (viii)     180-09 Jamaica Avenue, Jamaica, New York;

     (ix)     204-12 Hillside Avenue, Hollis, New York;

     (x)     220-01 Jamaica Avenue, Queens Village, New York;

     (xi)     227A East 105th Street, New York, New York;

     (xii)     2363 Ralph Avenue, Brooklyn, New York;

     (xiii)     240-19 Jamaica Avenue, Bellerose, New York;

     (xiv)     2488 Grand Concourse, Bronx, New York;

     (xv)     2625 Atlantic Avenue, Brooklyn, New York;

     (xvi)     3041 Avenue U, Brooklyn, New York;

     (xvii)     3209 Fulton Street, Brooklyn, New York;

     (xviii)     33-06 88th Street, Jackson Heights, New York;

     (xix)     332 E. 149th Street, Bronx, New York;

(xx)     3432-05 East Tremont Avenue, Bronx, New York;

(xxi)    4014A Boston Road, Bronx, New York;

(xxii)   409 Rockaway Avenue, Bronx, New York;

(xxiii)  430 W. Merrick Road, Valley Stream, New York;

(xxiv)   546 Howard Avenue, Brooklyn, New York;

(xxv)    550 Remsen Avenue, Brooklyn, New York;

(xxvi)   60 Belmont Avenue, Brooklyn, New York;

(xxvii)  615 Seneca Avenue, Brooklyn, New York;

(xxviii) 632 Utica Avenue, Brooklyn, New York;

(xxix)   6937 Myrtle Avenue, Glendale, New York;

(xxx)    764 Elmont Road, Elmont, New York;

(xxxi)   788 Southern Boulevard, Bronx, New York;

(xxxii)  86-55 Broadway, Elmhurst, New York; and

(xxxiii) 97-01 101st Avenue, Ozone Park, New York.

168.    As the above No-Fault Clinic lists demonstrates, the fact that the Layperson Controllers were able to operate 10 or more different transient healthcare providers on a revolving door basis from a large swath of No-Fault Clinics underscores the Layperson Controllers, through the Provider Defendants, maintained illegal kickback and referral relationships with the No-Fault Clinics controllers and/or healthcare providers.

169.    At each of these locations, pursuant to the illegal kickback and referral arrangements, the Defendants allegedly rendered, or caused to be rendered, ROM/MT, ALM Tests, and/or PfNCS to Insureds.  In exchange for being allowed to perform the Fraudulent Services, the Defendants paid the clinic controllers and/or referring medical providers and agreed that the results of the Fraudulent

Services would be pre-ordained, so they could be used to justify further treatment and corresponding bills to State Farm Mutual and State Farm Fire by the other healthcare providers at the No-Fault Clinics.

170.    The relationships that allowed Defendants to operate their transient healthcare practices were not designed for a legitimate purpose.  The Defendants and the healthcare providers and/or clinic controllers at these various No-Fault Clinics agreed that Defendants would be given access to the No-Fault Clinics' Insureds in exchange for: (i) payments, such as those in the form of ostensibly legitimate fees for "rent," equipment, personnel, transportation, or other types of services; and/or (ii) providing the Fraudulent Services, which virtually always supported continued performance of healthcare services by the healthcare providers and/or clinic controllers.  This quid-pro-quo allowed the Defendants to financially benefit through access to patients needed in order to submit their fraudulent billing and enabled the healthcare providers and/or clinic controllers to financially benefit by way of direct payments and/or from Defendants' treatment protocol purportedly justifying further billing for the healthcare providers' and/or clinic controllers' medically unnecessary services.

171.    Rather than through legitimate means, the Provider Defendants' "success" was the product of these illegal kickback and referral arrangements, which enabled them to provide the Fraudulent Services at as many different treating locations as possible to maximize billing while, at the same time, making it harder for State Farm Mutual and State Farm Fire to detect the totality of Defendants' fraudulent scheme.

172.    Several of these No-Fault Clinic locations were "revolving doors" of healthcare providers, including the Provider Defendants, billing for services purportedly provided to Insureds at the location.

173.     Notably, some of the No-Fault Clinic locations have a well-known history of no-fault insurance fraud; the US Government has previously identified several providers that performed services at some of these locations as set up "solely" for, or used in furtherance of, an organized no-fault fraud crime ring. See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012) (JPO). These locations include (i) 5006 Avenue N, Brooklyn, New York; (ii) 632 Utica Avenue, Bronx, New York; (iii) 764 Elmont Road, Elmont, New York; (iv) 1500 Astor Avenue, Bronx, New York; (v) 227A East 105th Street, New York, New York; (vi) 1552 Ralph Avenue, Brooklyn, New York; (vii) 172-17 Jamaica Avenue, Jamaica, New York; and (viii) 1 Fulton Avenue, Hempstead, New York.

174.     Likewise, at least six of the No-Fault Clinic locations were identified by the Government to have been controlled by laypersons involved in a no-fault crime ring whereby they illegally owned and controlled medical practices operating from the locations and improperly obtained patients by paying runners and patient brokers, who steered patients to the clinics.  These locations include (i) 2625 Atlantic Avenue, Brooklyn, New York; (ii) 332 E. 149th Street, Bronx, New York; (iii) 105-10 Flatlands Avenue, Brooklyn, New York; (iv) 204-12 Hillside Avenue, Hollis, New York; (v) 6937 Myrtle Avenue, Glendale, New York; and (vi) 764 Elmont Road, Elmont, New York.  See United States of America v. Rose, 19-CR-00789 (S.D.N.Y. 2021) (PGG).

175.     At nearly all of the No-Fault Clinics, the Insureds are subjected to multiple medical, chiropractic, acupuncture, and neurological evaluations, numerous modality treatments, and a variety of other diagnostic tests, which underscores the Fraudulent Services performed by the Defendants are not provided because they are medically necessary, but are instead provided to enrich the Defendants and the healthcare providers and/or clinic controllers with whom they had illegal kickback and referral arrangements.

2.      The Patient Broker Kickback Scheme

176.    Second, the Layperson Controllers caused the many of the Provider Defendants to pay millions of dollars in exchange for patient referrals, access to the No-Fault Clinics, and/or to launder the proceeds of the fraudulent scheme.  Among these entities were a series of shell companies – disguised as, among other things, "consulting," "medical testing," "business supplies," "billing," and/or "collections" companies – that are secretly owned and operated Dovman or Struzberg (the "Dovman Shell Companies" or the "Struzberg Shell Companies").  In addition to the Dovman Shell Companies, Dovman controlled an attorney operating account of Daniel J. Corley, Esq. (the "Corley Account"), through which Dovman also received kickback payments.

177.    In exchange for these payments, Dovman brokered and illegally referred Insureds to the No-Fault Clinics and the Provider Defendants.  See GEICO, et al. v. Mayzenberg, et al., 17-cv-2802 (E.D.N.Y.) (hereinafter, "Mayzenberg").  Similarly, Struzberg brokered and illegally referred Insureds to the No-Fault Clinics and Provider Defendants once the Layperson Controllers ceased paying Dovman.

178.    For example, Tandingan PT and Dignity PT wrote checks to the Dovman Shell Companies and the Corley Account in excess of $500,000.00, all of which was immediately converted into cash by Dovman.

179.    By way of further example, MMA PT, Therapy Zone, Fialkov PC, Rehab Care, McDonald Ave Chiropractic, RF Chiropractic, and Comfort PT wrote checks to the Struzberg Shell Companies in excess of $2,280,000.00, all of which was immediately converted into cash by Struzberg.

180.     Dovman, through the Dovman Shell Companies and the Corley Account, and Struzberg through the Struzberg Shell Companies, funneled the Provider Defendants' payments to others in exchange for the referral of patients, access to the No-Fault Clinics, and/or to launder the proceeds of the fraudulent scheme.

181.     The payments that the Provider Defendants paid to the Shell Companies were not for any legitimate "consulting," "medical testing," "business supplies," "billing," and/or "collections" service or, in the case of the Corley Account, for any legitimate legal services. Instead, the Defendants disguised the payments as being for "legal," "consulting," "medical testing," "business supplies," "billing," and/or "collections" services in order to conceal the illicit nature of the payments.

182.     Though the Struzberg Shell Companies and Dovman Shell Companies were named to create the appearance that they provided services such as "consulting," "medical testing," "business supplies," "billing," and/or "collections" services, they did not provide any legitimate goods or services.

183.     Rather, these payments to the Struzberg Shell Companies, Dovman Shell Companies, and the Corley Account were made in return for patient referrals and access to patient bases at the No-Fault Clinics.

184.     Though the Corley Account was maintained to appear as if it was used in connection with rendering legal services, there are no indications Corley ever provided any legitimate legal services to the Defendants.

185.     In keeping with the fact that the Corley Account was not used for legitimate purposes, when asked several questions regarding the Corley Account during a March 12, 2018

deposition in <u>Mayzenberg</u>, Corley repeatedly invoked his Fifth Amendment privilege against self-incrimination. <u>See</u> <u>Mayzenberg</u>, ECF No. 119-7 at 230-33.

186.    In keeping with the fact that the Dovman Shell Companies were set up as nothing more than vehicles that served to funnel kickback payments for patient referrals, Dovman actively sought to conceal that he was owner of the Dovman Shell Companies. For example, Dovman filed certificates of incorporation with New York State listing individuals as the "incorporator" of the respective entity who either: (i) did not exist; or (ii) had no apparent connection to the underlying entity.

187.    In fact, for many of these certificates of incorporation, Dovman listed an individual as the "incorporator" and represented that that individual had electronically signed the certificate without the putative "incorporator's" knowledge or consent.

188.    For example, Annesah Phillip Cox signed an affidavit, which was submitted in <u>Mayzenberg</u>, stating that she: (i) had no knowledge whatsoever of the incorporation or existence of an entity titled Best AC Medical Supply, Inc.; and (ii) never gave Dovman, or anyone, authority to represent that she had electronically signed the certificate of incorporation for Best AC Medical Supply, Inc. <u>See</u> <u>Mayzenberg</u>, ECF No. 119-16 (Cox Affidavit and Best AC Medical Supply, Inc. Certificate of Incorporation).

189.    Similarly, in <u>Mayzenberg</u>, Boris Popov signed an affidavit stating that he: (i) had no knowledge whatsoever of the incorporation or existence of an entity titled Green BH Inc.; and (ii) never gave Dovman, or anyone, authority to represent that she had electronically signed the certificate of incorporation for Green BH Inc. <u>See</u> <u>Mayzenberg</u>, ECF No. 119-17 (Popov Affidavit and Green BH Inc. Certificates of Incorporation).

190.    Years before his name was used on the certificates of incorporation for Green BH Inc., Boris Popov hired a law firm he believed was run by Corley at 2765 Coney Island Avenue, Brooklyn, New York 11235 (the "Coney Island Law Office").  See id.

191.    Not coincidentally, Dovman shared office space with Corley at the Coney Island Law Office during the time period that healthcare practices, including Provider Defendants, made payments to the Corley Account.  However, Dovman secretly and illegally controlled the Corley Account and siphoned the money paid by the Provider Defendants and others for use in the fraudulent scheme.

192.    In furtherance of the fraudulent scheme, many of the Provider Defendants and others associated with the fraudulent scheme paid kickbacks in exchange for patient referrals to at least the following Dovman Shell Companies, all of which listed a phony "incorporator" on their respective certificates of incorporation but were actually owned and controlled by Dovman:

| Shell Company | Nominal Incorporator | True Owner |
|---|---|---|
| AC Billing & Collections, Inc. | Anna Chaudrey | Dovman |
| Best AC Medical Supply, Inc. | Annesah Phillip Cox | Dovman |
| Green BH, Inc. | Boris Popov | Dovman |
| Kornel Plus, Inc. | Kornel Krikovsky | Dovman |
| Krik Medical Testing, Inc. | Kornel Krikovsky | Dovman |
| Sher Medical Testing, Inc. | Sherzod Narzullaev | Dovman |

193.    In keeping with the fact that Dovman was the true owner of the Dovman Shell Companies, Dovman submitted fake certificates of incorporation to various banking institutions that listed him as the president and/or incorporator of several of the Dovman Shell Companies in order to allow him to open corporate bank accounts in the Dovman Shell Companies' names and to serve as their sole signatory.  Compare Mayzenberg, ECF No. 119-19 (Certificates of

Incorporation listing Phony Incorporators) <u>with</u> <u>Mayzenberg</u>, ECF No. 119-20 (Certificates of Incorporation listing Dovman as President/Incorporator).

194.     Neither the Dovman Shell Companies nor the Struzberg Shell Companies had any of the hallmarks of legitimate businesses. For example, none of the Dovman Shell Companies or Struzberg Shell Companies maintained a website, an apparent physical location, marketing materials, social networking presence, or employees.

195.     Further, in keeping with the fact that the Dovman Shell Companies were sham entities that existed for the purpose of funneling kickback payments, when asked during a March 9, 2018 deposition in <u>Mayzenberg</u> whether he had incorporated a series of companies as a means of concealing a fraudulent kickback scheme, Dovman invoked his Fifth Amendment protection against self-incrimination. <u>Mayzenberg</u>, ECF No. 119-5 at 145.

196.     In sum, the Defendants' illegal kickback and referral arrangements were essential to the success of their scheme.  The Defendants benefitted financially from their relationship with the No-Fault Clinics because without access to Insureds, they could not perform the Fraudulent Services, bill State Farm Mutual and State Farm Fire, or generate income from insurance claim payments.  At the same time, the voluminous list of healthcare services rendered to Insureds by healthcare providers at the No-Fault Clinics in connection with the fraudulent claims listed in Exhibits "1" and "31" were enabled by the Defendants' performance of the Fraudulent Services. Likewise, the Defendants' use of the patient brokers, the Transportation Corporations, and Check Cashers were vital to conceal their unlawful activity and ensure the continued success of the fraudulent scheme while reaping maximum profits.

197.     The Layperson Controllers' ownership and control over the Provider Defendants and the Nominal Owners allowed them to engage in these improper financial arrangements.  It

also allowed the Provider Defendants to be subject to the pecuniary interests of non-medical professionals and not the independent judgment of true medical professional-owners, which, as detailed below, resulted in pre-determined treatment and billing protocols that were not based on genuine patient care.

      **C.**    **The Defendants' Treatment and Billing Protocols**

      198.    Most Insureds who were referred to the Provider Defendants were reportedly involved in relatively minor accidents. Almost none of these Insureds suffered significant injuries or health problems as a result of these reported accidents.

      199.    Nonetheless, as detailed below, the Provider Defendants subjected nearly all Insureds to a medically unnecessary course of ROM/MT, ALM Tests, and/or PfNCS, provided pursuant to a pre-determined treatment protocol, for which the Provider Defendants then billed State Farm Mutual and State Farm Fire, often inflating and/or unbundling these charges to maximize the billings that could be generated.

      200.    Though they collectively provided the Fraudulent Services at over 115 different No-Fault Clinics, and despite purporting to be thirty-one separate entities, the Provider Defendants provided a virtually identical pre-determined treatment protocol to the Insureds without regard for the Insureds' individual symptoms or presentation.

      201.    Indeed, even though the Fraudulent Services were performed by numerous different healthcare practices, most of which have different owners who have no apparent relationship, at over 115 different no-fault clinics in the span of approximately three years, the overall treatment protocol remained the same.

      1.    The Medically Unnecessary ROM/MT

202.   Defendants Tandingan PT, Dignity PT, MMA PT, Therapy Zone, Rehab Care, Comfort PT, Atlas PT, MT PT, Elmwood Park, Best Hands-On PT, Suarez Medical, Heal-Rite, Molnar Medical, Wellness PT, MJG Medical, Perloff PT PC, Axis PT, MC PT, Inje PT, Inew Rehab, Pesidas PT PC, LZ Medical, and Better Hands PT (collectively, the "ROM/MT Defendants"), at the direction of the Layperson Controllers, subjected Insureds to one or more sessions of medically unnecessary ROM/MT.

203.   The ROM/MT Defendants billed State Farm Mutual and State Farm Fire for ROM/MT under multiple units of CPT codes 95851 and 95831, resulting in total charges of up to $976.68 for each session of ROM/MT.

204.   The charges for the ROM/MT were fraudulent in that: (i) the ROM/MT was medically unnecessary; (ii) the ROM/MT Defendants unbundled the charges for the ROM/MT to artificially increase the amount they could charge State Farm Mutual and State Farm Fire; and (iii) the ROM/MT were performed pursuant to the Defendants' pre-determined treatment protocol and the illegal kickback and referral arrangements between the Defendants.

a.   <u>Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength</u>

205.   The adult human body is made up of 206 bones joined together at various joints that are primarily of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

206.   The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion."  Stated in a more illustrative way, range of motion is the amount of movement at the joint.

207.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the limb actively or passively is moved around the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

208.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

209.    Physical evaluations performed on patients with soft-tissue trauma include range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, the ability to properly diagnose or treat the patient's injuries will be substantially limited. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" evaluation of a trauma patient.

210.    Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial and follow-up examinations.

211.     In other words, healthcare providers cannot conduct and bill for initial examinations and follow-up examinations, then bill separately for contemporaneously-provided range of motion and muscle strength tests.

        b.   <u>The ROM/MT Defendants' ROM/MT was Duplicative and Medically Unnecessary</u>

212.     At each of the No-Fault Clinics at which the ROM/MT Defendants allegedly rendered ROM/MT, the Insureds received manual range of motion and manual muscle tests during initial and follow-up examinations purportedly conducted by other healthcare providers at the No-Fault Clinics.

213.     The ROM/MT Defendants knew, prior to performing ROM/MT, that the Insureds had already received initial and/or follow-up examinations that included manual range of motion and manual muscle tests, as those initial and follow-up examinations served to justify the subsequent performance of the Fraudulent Services by the ROM/MT Defendants.

214.     Even though the ROM/MT Defendants knew that Insureds already had undergone manual range of motion and muscle testing during their initial and follow-up examinations from other healthcare providers, the ROM/MT Defendants systemically billed for, and purported to perform, ROM/MT on Insureds.

215.     The ROM/MT Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insured's body while the Insured was asked to attempt various motions and movements.  The test is virtually identical to the manual range of motion testing that is described above and that purportedly was performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

216.    The ROM/MT Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured is asked to press multiple times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial and follow-up examinations – except that a digital printout was obtained.

217.    The information gained through the use of the ROM/MT was not significantly different from the information obtained through the manual testing that was part and parcel of the Insured's initial and follow-up examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing is insignificant.

218.    While ROM/MT can be a medically useful tool as part of a research project, under the circumstances employed by the ROM/MT Defendants, at the direction of the Layperson Controllers, it unnecessarily duplicated the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial and follow-up examinations.

219.    In short, the ROM/MT was rendered pursuant to a pre-determined treatment protocol that: (i) did not aid in the assessment and treatment of the Insureds; and (ii) financially enriched the Defendants.

c.    The ROM/MT Defendants' Fraudulent Unbundling of Charges for

ROM/MT

220.     Not only did the ROM/MT Defendants deliberately purport to provide duplicative, medically unnecessary ROM/MT; they also unbundled their billing for the tests, which maximized the fraudulent charges they could submit to State Farm Mutual and State Farm Fire.

221.     Pursuant to the Fee Schedule, when both computerized range of motion tests and computerized muscle tests are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

222.     CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing. Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 under CPT code 97750, resulting in total charges of $91.42, and so forth.

223.     When the ROM/MT Defendants performed ROM/MT on any given date of service, they virtually always purported to provide both computerized range of motion and muscle tests to Insureds.

224.     The computerized range of motion and muscle tests – together – usually did not take more than 15 minutes to perform, but never took more than 30 minutes. Thus, even if the computerized range of motion and muscle tests that the ROM/MT Defendants purported to perform were medically necessary, the ROM/MT Defendants would usually be limited to a single, time-based charge of $45.71 under CPT code 97750, but, at most, two such charges totaling $91.42, for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

225.    Nonetheless, to maximize their fraudulent billing for the computerized range of motion and muscle tests, the ROM/MT Defendants unbundled what should be a single charge of $45.71 – or, at most, two charges totaling $91.42 – under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges ranging from $39.73 to $43.60 per unit billed under CPT code 95831 (for the computerized muscle tests); and (ii) multiple charges ranging from $41.66 to $45.71 per unit billed under CPT code 95851 (for the computerized range of motion tests).

226.    By unbundling what should be a single $45.71 charge – or, at most, two charges totaling $91.42 – under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, the ROM/MT Defendants increased by significant orders of magnitude the charges for the ROM/MT that they submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire. The ROM/MT Defendants routinely submitted billing for ROM/MT rendered to an Insured on a single date of service for amounts ranging up to $976.68 for each session of medically unnecessary ROM/MT.

        d.     The ROM/MT Defendants' Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the ROM/MT

227.    Not only were the ROM/MT Defendants' charges for the ROM/MT fraudulent because the tests were duplicative, medically unnecessary, and because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that the ROM/MT Defendants prepared written reports interpreting the test data.

228.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT code 95851 or for computerized muscle testing using CPT code 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

229.     The CPT Assistant also states that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95831 to charge for muscle testing.

230.     Though the ROM/MT Defendants routinely submitted billing for the computerized range of motion and muscle strength tests using CPT codes 95851 and 95831, the medical records submitted by the ROM/MT Defendants to State Farm Mutual and State Farm Fire did not include written reports interpreting the data obtained from the tests.

231.     Therefore, even if the ROM/MT Defendants had satisfied the other requirements to submit their billing for ROM/MT under CPT codes 95851 and 95831 – and they did not – the ROM/MT Defendants' billing still did not comply with the Fee Schedule due to their failure to submit a separate, distinctly identifiable, and signed written report interpreting the results of the purported ROM/MT for any Insured.

232.     The ROM/MT Defendants did not prepare written reports interpreting the data obtained from the ROM/MT because the tests were not meant to impact any Insured's course of treatment. Rather, the ROM/MT were performed at the direction of the Layperson Controllers as part of the Defendants' fraudulent pre-determined treatment and billing protocols, which enriched the Defendants at the expense of State Farm Mutual and State Farm Fire, and as part of the Defendants' illegal kickback and referral arrangements with the No-Fault Clinics' controllers and/or healthcare providers.

2.     The Medically Unnecessary "Activity Limitation Measurements" Tests

233.     In addition to the medically unnecessary computerized ROM/MT, the ROM/MT Defendants and Chiropractic Diagnostic (collectively, the "ALM Defendants"), at the direction of the Layperson Controllers, subjected Insureds to medically unnecessary ALM Tests.

234.   With the exception of MJG Medical, the ALM Defendants each billed State Farm Mutual and State Farm Fire for the ALM Tests using CPT code 97799 at a charge of $475.00 per date of service. CPT code 97799 is an "unlisted physical medicine/rehabilitation procedure" and is a by-report code for which the Fee Schedule does not set the reimbursement amount.

235.   For its part, MJG Medical billed State Farm Mutual and State Farm Fire for the ALM Tests using CPT Code 97750 at the same charge of $475.00 per date of service.

236.   Like their charges for the other Fraudulent Services, the ALM Defendants' charges for ALM Tests were fraudulent in that the tests were: (i) medically unnecessary; and (ii) performed at the direction of the Layperson Controllers pursuant to the ALM Defendants' fraudulent treatment protocol and improper referral and financial arrangements between the ALM Defendants and the No-Fault Clinics' controllers and/or healthcare providers.

237.   The ALM Defendants purported to provide ALM Tests to Insureds despite their knowledge that the ALM Tests were medically unnecessary and duplicative of the manual range of motion and muscle strength tests that were performed during the initial examinations and/or follow-up examinations, and/or the ROM/MT that almost all of ALM Defendants also purported to perform.

238.   Much like the duplicative ROM/MT, the only substantive difference between the ALM Tests and the manual range of motion and manual muscle strength tests purportedly provided by the No-Fault Clinics during the initial examinations and follow-up examinations is that ALM Tests generate a digital printout of an Insured's muscle strength.

239.   The muscle strength data obtained through the use of ALM Tests was not significantly different from the information obtained through the manual testing that was part and parcel of the examinations purportedly provided by the No-Fault Clinics to the Insureds.

240.    Nor was the muscle strength data obtained through the use of the ALM Tests significantly different from the data that the Defendants obtained through the ROM/MT they purported to provide to Insureds.

241.    Under the circumstances employed by the ALM Defendants, the ALM Tests represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during the initial and follow-up examinations, and of the medically unnecessary ROM/MT, all of which the ALM Defendants purportedly conducted in addition to the manual range of motion and muscle strength testing.

242.    Not only did the ALM Defendants purport to provide duplicative, medically unnecessary ALM Tests; they also billed in excess of the Fee Schedule for the ALM Tests, again maximizing the fraudulent charges that they could submit to State Farm Mutual and State Farm Fire.

243.    Pursuant to the Fee Schedule, ALM Tests should be billed under CPT code 97750 at a charge of $45.71 per unit, for every 15 minutes of testing.

244.    CPT code 97750, which is described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes," (emphasis added) identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also include creation of a written report.

245.    Instead of billing under the proper code, almost all of the ALM Defendants submitted massively inflated charges for ALM Tests under CPT code 97799 at a charge of $475.00

per date of service. Through this fraudulent billing protocol, the ALM Defendants inflated the charges they submitted to State Farm Mutual and State Farm Fire for each distinct session of ALM Tests by nearly five hundred percent (500%) to over one-thousand percent (1000%)—submitting a bill for $475.00 for what should have been a single charge of $45.71 or, at most, two charges totaling $91.42, as the testing usually did not take more than 15 minutes to perform, but never took more than 30 minutes.

246.    Though MJG Medical billed under the proper CPT code, its charge of $475.00 per date of service falsely represents that it spent approximately two and a half hours performing the ALM Tests per date of service.  Because the testing usually did not take more than 15 minutes to perform, but never took more than 30 minutes, MJG Medical also inflated the charges it submitted to State Farm Mutual and State Farm Fire by submitting a bill for $475.00 for what should have been a single charge of $45.71 or, at most, two charges totaling $91.42.

247.    Like the other tests discussed herein, the ALM Tests were not meant to impact any Insured's course of treatment. Rather, the ALM tests were performed at the direction of the Layperson Controllers as part of the Defendants' fraudulent pre-determined treatment and billing protocols, which enriched the Defendants at the expense of State Farm Mutual and State Farm Fire, and as part of the Defendants' illegal kickback and referral arrangements with the No-Fault Clinics' controllers and/or healthcare providers.

### 3.   The Fraudulent PfNCS

248.    Chiropractic Diagnostic, Fialkov PC, McDonald Ave Chiropractic, RF Chiropractic, Jean-Gilles, Mill Medical, Crosstown Chiropractic, and GM Wellness (collectively, the "PfNCS Defendants"), at the direction of the Layperson Controllers, purported to subject many Insureds to a series of medically unnecessary pain fiber nerve conduction studies, which are

alternatively known as voltage-actuated sensory nerve conduction threshold tests, current perception threshold tests, and sensory nerve conduction threshold tests (collectively, the "PfNCS tests").

249.    The charges for the PfNCS tests were fraudulent in that the PfNCS tests were medically unnecessary and were performed, not to treat or otherwise benefit the Insureds, but instead pursuant to the PfNCS Defendants' predetermined treatment protocol and illegal kickback and referral arrangements between the PfNCS Defendants, in coordination with the Layperson Controllers, and the No-Fault Clinics' controllers and/or healthcare providers.

a.   The Human Nervous System and Electrodiagnostic Testing

250.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

251.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

252.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

253.    Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

254.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A disease or

dysfunction of the peripheral nerves is called a neuropathy, and can cause various symptoms and signs including pain, numbness, weakness, and reflex changes. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, and loss of muscle control.

255.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

256.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "32."

257.    The Recommended Policy does not identify PfNCS tests as having any documented usefulness in diagnosing radiculopathies. See Exhibit "32."  In fact, PfNCS tests are not recognized as having any value in the diagnosis of any medical condition.

b.    Legitimate Tools for Neuropathy Diagnosis

258.    The PfNCS Defendants supposedly provided the PfNCS tests to Insureds in order to diagnose abnormalities in the Insureds' peripheral nerves and nerve roots.

259.    Three primary diagnostic tools are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and in the nerve roots (i.e.,

radiculopathies).   These diagnostic tests are nerve conduction velocity ("NCV") tests, electromyography ("EMG") tests, and magnetic resonance imaging tests ("MRIs").

260.    Except in very limited circumstances, for diagnostic purposes NCV tests and EMG tests are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

261.    If NCV tests and EMG tests are necessary to diagnose nerve damage, they should be performed no fewer than 14-21 days following an auto accident because it typically takes at least that long for nerve damage to appear following a trauma.

262.    MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue, and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots, and surrounding areas.

c.    PfNCS Testing Is Not a Legitimate Tool for Neuropathy Diagnosis

263.    The PfNCS test is a type of non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

264.    Unlike NCV testing, PfNCS testing does not measure velocity, amplitude, or latency of a sensory nerve's action potential.

265.    The sensory nerves are comprised of three different kinds of nerve fibers: the A-beta fibers, the A-delta fibers, and the C fibers. The PfNCS tests allegedly can diagnose the existence, nature, extent, and location of any abnormal condition in each of these specific nerve fibers by using three different frequencies of electrical current. Specifically, the use of electrical

currents with frequencies of 5 Hz, 250 Hz, and 2000 Hz allegedly stimulate and thereby test the C fibers, the A-delta fibers, and the A-beta fibers, respectively.

266.    PfNCS tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet, and/or face. The voltage is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. "Findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

267.    If the patient's sensation threshold is greater than the purported "normal range" of voltage required to evoke a sensation, it allegedly indicates the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the voltage required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

268.    In actuality, however, t no reliable, peer-reviewed data establishes normal response ranges in PfNCS testing.

269.    Specifically, there is no reliable evidence of the existence of normal ranges of intensity or voltage required to evoke a sensation using a PfNCS test device. Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal PfNCS test results are normal or abnormal.

270.    Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a PfNCS test device, no reliable evidence proves that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that sensation threshold less than the normal range would indicate a hyperesthetic condition.

271.    Similarly, even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, no reliable evidence proves that the extent or cause of any such conditions could be identified from PfNCS tests. Indeed, numerous pathological and physiological conditions other than peripheral nerve damage can cause hyperesthesia and hypoesthesia.

272.    Furthermore, even if PfNCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

> (i)    no reliable evidence proves that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;
>
> (ii)    no reliable evidence proves that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;
>
> (iii)    no reliable evidence proves that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;
>
> (iv)    PfNCS tests do not provide any information regarding the motor nerves or motor nerve roots, which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and
>
> (v)    there would be no legitimate diagnostic advantage to using PfNCS tests to obtain information regarding the sensory nerve fibers where, as here, the PfNCS tests were duplicative of provided NCV tests, EMG tests, and MRIs.

273.    Simply put, no legitimate medical evidence supports the conclusion that PfNCS tests are in any way useful, let alone medically necessary, to diagnose neuropathies in general or radiculopathies in particular.

274.    Notably, the Centers for Medicare & Medicaid Services ("CMS") have determined that PfNCS tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and radiculopathies and therefore are not compensable. Copies of the pertinent CMS Decision Memo and National Coverage Determination are annexed hereto as Exhibit "33."

275. Finally, also in keeping with the fact that the PfNCS Defendants' putative PfNCS tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for PfNCS tests.

d. Each of the Two Main PfNCS Test Device Manufacturers Claims the Other is a Fraud

276. Until 2004, about the same time that CMS was considering the medical benefits of PfNCS testing before ultimately issuing its National Coverage Determination denying Medicare coverage of PfNCS tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

277. Neurotron, Inc. manufactured a device called the "Neurometer." Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000." While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

278. In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II."

279. Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

280. Upon information and belief, the PfNCS tests were provided to Insureds using an Axon-II or re-branded Medi-Dx 7000 device.

281.   Neuro Diagnostic Associates, Inc. claims that the Neurometer does not produce valid data or results, and has been fraudulently marketed.  For its part, Neurotron Inc. has asserted the same claims regarding Neuro Diagnostic Associates, Inc.'s Medi-Dx 7000/Axon-II.

e.   The PfNCS Defendants' Medically Unnecessary PfNCS Tests

282.   Pursuant to their fraudulent pre-determined treatment and billing protocols and illegal kickback and referral arrangements with the No-Fault Clinics' controllers and/or healthcare providers, the PfNCS Defendants, at the direction of the Layperson Controllers, purported to subject Insureds to a series of medically unnecessary PfNCS tests.

283.   The PfNCS Defendants billed the PfNCS tests to State Farm Mutual and State Farm Fire as charges under CPT codes 95904 and/or 95599, generally resulting in charges of ranging of $1,019.62 to $1916.46 per cervical or lumbar PfNCS for each Insured. Often, the PfNCS Defendants billed State Farm Mutual and State Farm Fire for two PfNCS tests, one cervical PfNCS and one lumbar PfNCS, for an Insured on the same date of service, resulting in charges totaling upwards of $3,407.04.

284.   The PfNCS Defendants purported to subject many Insureds to PfNCS tests, supposedly to diagnose neuropathies, including radiculopathies.

285.   As a threshold matter, the PfNCS tests were medically unnecessary because, for all the reasons discussed above, no legitimate medical evidence establishes that PfNCS tests are useful in diagnosing any medical condition, let alone neuropathies.

286.   The PfNCS tests were also medically unnecessary because virtually every Insured who purportedly was subjected to the Defendants' PfNCS tests also received NCVs, EMGs, and MRIs, services which are performed to diagnose neuropathies.

287.    Even if the PfNCS tests purportedly provided by the PfNCS Defendants had any legitimate value in the diagnosis of neuropathies, they were duplicative of the NCV tests, EMG tests, and MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the PfNCS tests that the PfNCS Defendants purported to provide.

288.    Though unsupported by any legitimate medical evidence, the alleged benefit of PfNCS tests is their supposed capability of diagnosing abnormalities in sensory nerves less than 14-21 days following an accident, which is sooner than NCV tests and EMG tests can be used to effectively diagnose nerve damage following an accident.

289.    Assuming that claim had substance (it does not), the PfNCS Defendants frequently purported to provide PfNCS tests to Insureds more than 21 days <u>after</u> an Insured's accident, the point in time at which NCV and EMG tests can effectively diagnose nerve damage.

290.    Further, the PfNCS Defendants often purported to provide PfNCS tests to Insureds <u>after</u> the Insured had already received NCV and EMG tests, rendering those PfNCS tests wholly duplicative the moment they were allegedly performed. (Again, assuming PfNCS tests had any medical utility in diagnosing neuropathies, which they do not.)

291.    Under the circumstances in which they were employed by the PfNCS Defendants, the purported PfNCS tests were medically unnecessary and duplicative of the NCV tests and EMG tests, both of which virtually every Insured also received.

292.    Even assuming there was some diagnostic value for PfNCS tests, the PfNCS tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through NCVs, EMGs and/or MRIs.

293.    In keeping with the fact that the PfNCS Defendants' purported PfNCS tests were medically unnecessary and could not possibly have provided any additional diagnostic value, the putative "results" of the PfNCS Defendants' PfNCS tests were not incorporated into any Insured's treatment plan, nor did the PfNCS tests play any genuine role in the treatment or care of the Insureds.

f.    The PfNCS Defendants' Fraudulent Test "Reports"

294.    In support of their fraudulent charges for the PfNCS tests, the PfNCS Defendants submitted PfNCS test "reports" falsely representing that the PfNCS Defendants' respective Nominal Owners had some role in performing and interpreting the tests.

295.    In actuality, the PfNCS tests were performed by unlicensed independent contractor technicians, and neither the PfNCS Defendants' respective Nominal Owners nor any other licensed healthcare provider associated with the PfNCS Defendants had a role either in performing the tests or interpreting the test results.

296.    In keeping with the fact that the PfNCS tests were performed by unlicensed technicians, rather than by a licensed physician associated with the PfNCS Defendants, the PfNCS test "reports" did not contain any genuine interpretation of the test data.

297.    Instead, the PfNCS test "reports" each contained a "Diagnostic Summary" section that was generated by the PfNCS test device and was included to foster the illusion that a licensed healthcare professional had some role in performing or interpreting the tests.

298.    Indeed, despite bearing the signatures of the PfNCS Defendants' respective Nominal Owners, the PfNCS Defendants' "Diagnostic Summary" section of the PfNCS test "reports" did not contain any interpretation of the data that the PfNCS Defendants purported to obtain from the tests.

299.    Finally, the PfNCS Defendants billed for the PfNCS tests as if they were provided and/or interpreted by the Nominal Owners, rather than by the unlicensed technicians, which made it appear as if the services were medically necessary and eligible for reimbursement, despite knowing they were not.

### III.    The Fraudulent Billing for Services Provided by Independent Contractors

300.    Defendants' fraudulent scheme also included submission of claims to State Farm Mutual and State Farm Fire seeking payment for services at least some, if not all of which were, performed by independent contractors. Under the No-Fault Laws, professional service corporations are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the owner of the professional corporation or by its employees.

301.    Since 2001, the New York State Insurance Department has consistently reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October

29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (refusing to modify earlier opinions). Copies of these Opinion Letters are annexed hereto as Exhibit "34."

302.   The Defendants' bills to State Farm Mutual and State Farm Fire through the Provider Defendants for Fraudulent Services represented that Jean-Gilles or the respective Provider Defendants' Nominal Owner was the "treating provider" by printing the pertinent name on the bills and including the pertinent Nominal Owner's signature on corresponding medical reports.

303.   In reality, many, if not all, of these representations were false. Most if not all of the Fraudulent Services were instead performed by unlicensed technicians whom the Provider Defendants purposely, in order to maximize their profits, concealed from State Farm Mutual and State Farm Fire and treated as independent contractors rather than direct employees.

304.   Several Insureds provided Examination Under Oath ("EUO") testimony to State Farm Mutual and State Farm Fire regarding the Fraudulent Services allegedly performed by the Defendants.  While none of the Insureds knew the names of the individuals who rendered the Fraudulent Services, the Insureds' descriptions of those individuals did not match descriptions of the Nominal Owner Defendants.

305.   In addition, for several of the Provider Defendants, State Farm Mutual and State Farm Fire obtained financial records showing the Provider Defendants paid entities associated with ROM/MT and PfNCS technicians who perform services as independent contractors for various entities, including almost all of the Provider Defendants.

306.   Corroborating the Insureds' EUO testimony and the financial records, the bills Defendants submitted to State Farm Mutual and State Farm Fire frequently list the Nominal Owners performing the healthcare services at different No-Fault Clinics across New York City on the same

date of service.

307.    The Defendants concealed the true identity of the individuals rendering the Fraudulent Services because they knew that insurers, including State Farm Mutual and State Farm Fire, would not pay bills for services rendered by independent contractors as such practice is in contravention of New York law.

308.    Further maximizing their profits, in each instance Defendants elected to treat the individuals rendering services as independent contractors, the Provider Defendants realized significant economic benefits – for instance, avoiding:

(i)     the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     the need to secure any malpractice insurance; and

(vi)    claims of agency-based liability arising from work performed by the healthcare professionals and/or technicians.

309.    In addition to the fact that the Provider Defendants are ineligible to receive No-Fault Benefits because they were operated by the Layperson Controllers, were parties to illegal kickback and referral arrangements, and rendered medical unnecessary diagnostic testing services, the Provider Defendants also never have had any right to bill for or to collect No-Fault Benefits for any Fraudulent Services that were performed by independent contractors.

**IV.    The Billing Submitted to State Farm Mutual and State Farm Fire**

310.  To support the fraudulent charges, the Defendants systematically submitted or caused to be submitted statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 forms), medical records, and supporting documentation seeking payment for services for which the Defendants were, and are, ineligible to receive payment.

311.  The NF-3 forms, medical records, and supporting documentation submitted to State Farm Mutual and State Farm Fire by or on behalf of the Provider Defendants were false and misleading in the following material respects:

(i)     Through this documentation, the Provider Defendants misrepresented to State Farm Mutual and State Farm Fire that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary but Defendants provided these services pursuant to a pre-determined protocol and illegal kickback and referral relationships that financially enriched the Defendants, rather than legitimately treating or otherwise benefiting the Insureds;

(ii)    The charges reflected in the documentation submitted by or on behalf of the Provider Defendants misrepresented and/or exaggerated the scope and/or level of services that purportedly were provided;

(iii)   The documentation submitted by or on behalf of the Provider Defendants misrepresented to State Farm Mutual and State Farm Fire that the Provider Defendants were in compliance with all material licensing laws, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Provider Defendants operated in violation of material licensing laws in that they were owned, operated, and/or controlled by the Layperson Controllers. In addition, the Provider Defendants violated material licensing law by engaging in illegal kickback and referral arrangements; and

(iv)    The documentation submitted by and on behalf of the Provider Defendants misrepresented to State Farm Mutual and State Farm Fire that they were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that were allegedly performed because these services were performed by licensed healthcare providers. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-

Fault Benefits for most, if not all, such services because they were provided by independent contractors.

## V. The Defendants' Fraudulent Concealment and State Farm Mutual's and State Farm Fire's Justifiable Reliance

312. The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing and other documentation they submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire.

313. To induce State Farm Mutual and State Farm Fire to promptly pay charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

314. Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants were not in compliance with the material licensing laws because the Provider Defendants were owned, operated, and/or controlled by the Layperson Controllers.

315. Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent State Farm Mutual and State Farm Fire from discovering that the Defendants derived their patient base and referrals through illegal kickback and referral relationships, another violation of material licensing laws. Indeed, the Defendants entered into illegal kickback and/or referral arrangements that were designed to, and did, conceal the true nature of these arrangements.

316. In addition, the Defendants knowingly misrepresented and concealed facts to prevent State Farm Mutual and State Farm Fire from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a pre-determined protocol that maximized the charges that could be submitted to State Farm Mutual and State Farm Fire.

317.    The Defendants also knowingly misrepresented and concealed facts to prevent State Farm Mutual and State Farm Fire from discovering that, through their charges, the Defendants misrepresented and exaggerated the level of services purportedly provided to maximize the charges submitted to State Farm Mutual and State Farm Fire.

318.    In addition, in each instance that the Fraudulent Services were performed by independent contractors, the Defendants knowingly misrepresented and concealed facts related to the employment status of the healthcare professionals and/or technicians associated with the Provider Defendants to prevent State Farm Mutual and State Farm Fire from discovering that the healthcare professionals and/or technicians performing the Fraudulent Services were not employed by the Provider Defendants. Indeed, the Defendants misrepresented the identities of the individuals who purportedly performed the Fraudulent Services in order to conceal the fact that at least some of, if not all of, the services were performed by independent contractors.

319.    At the direction of the Layperson Controllers, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing State Farm Mutual and State Farm Fire from identifying the pattern of fraudulent charges submitted through any one entity.

320.    State Farm Mutual and State Farm Fire are under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents submitted to State Farm Mutual and State Farm Fire in support of the charges at issue, combined with the material misrepresentations and misconduct described above, were designed to and did cause State Farm Mutual and State Farm Fire to rely upon them.  As a result, State Farm Mutual

and State Farm Fire incurred damages of more than $1,677,000.00 based upon payments made by State Farm Mutual and State Farm Fire in reliance on the charges that the Defendants submitted.

321.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm Mutual and State Farm Fire, State Farm Mutual and State Farm Fire did not discover and could not reasonably have discovered that their damages were attributable to fraud until a comprehensive investigation, including, but not limited to a review of the patterns reflected in the bills and supporting documentation the Defendants submitted to State Farm Mutual and State Farm Fire, was conducted and substantially completed.

## FIRST CAUSE OF ACTION
**Against the Layperson Controllers and John Doe Defendants 1-10**
**(Violation of 18 U.S.C. § 1962(c))**

322.    State Farm Mutual and State Farm Fire incorporate, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

323.    The Layperson Controllers, Provider Defendants, Nominal Owners, Transportation Corporations, Check Cashers, Zaretser, John Doe Defendants 1-10, and others not named as Defendants herein, together constitute a separate association-in-fact "enterprise" (the "Transient Diagnostic Testing Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

324.    At all times relevant to this Complaint, the Layperson Controllers were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), with the Layperson Controllers having an existence separate and apart from the Transient Diagnostic Testing Enterprise.

325.    The members of the Transient Diagnostic Testing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and

consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically: (i) the Layperson Controllers are unlicensed individuals that directed the fraudulent billing and implemented a fraudulent predetermined treatment protocol with assistance from the Provider Defendants, Nominal Owners, and others; (ii) the Nominal Owners are healthcare professionals who allowed their healthcare licenses to be used by the Layperson Controllers to commit fraud; (iii) in order to carry out the fraudulent scheme, the Nominal Owners incorporated and/or allowed their professional entities or their personal tax identification numbers in order to enable the Layperson Controllers' scheme while purporting to act on paper as the sole shareholder, director, and/or officer that oversaw the day-to-day operations of their respective Provider Defendants' healthcare practices; (iv) the Layperson Controllers, Provider Defendants, Zaretser, and John Doe Defendants 1-10 facilitated the submission of fraudulent bills to State Farm Mutual and State Farm Fire; (v) the Layperson Controllers illegally owned and/or controlled the Provider Defendants, as well as illegally controlled Jean-Gilles's medical practice; (vi) the Provider Defendants, with the assistance of the Layperson Controllers, used independent contractors to provide the Fraudulent Services, in violation of New York law; (vii) the Provider Defendants, with the assistance of the Layperson Controllers, entered into illegal kickback and referral arrangements in order to expand the number of No-Fault Clinic locations at which they could carry out the fraudulent scheme, in violation of New York law; and (viii) to secretly siphon the proceeds of the fraudulent scheme, launder those proceeds, and convert the proceeds into cash, the Layperson Controllers conspired with the Transportation Corporations and Check Cashers, which each was responsible for funneling the proceeds of the fraudulent scheme at the Layperson Controllers direction.  Accordingly, by associating together to form the Transient Diagnostic Testing Enterprise, the Defendants were able

to accomplish their unlawful goals to an extent that would not have been possible had they acted alone or without the aid of each other – namely, carrying out a scheme to defraud of massive size and scope, maximizing their profits, evading detection by operating as successor entities, and operating and generating profits from a total of over 115 different No-Fault Clinic locations.

326.    The Layperson Controllers knowingly conducted and/or participated, directly or indirectly, in the conduct of the Transient Diagnostic Testing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of bills and supporting documentation on a continuous basis for over two years seeking payments to which the Defendants were not entitled under the No-Fault Laws.  Specifically, the acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341:

(i)     The Layperson Controllers devised, executed, and/or knowingly assisted in carrying out a scheme and artifice to defraud State Farm Mutual and State Farm Fire of their money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the healthcare claims for payment;

(ii)    Pursuant to the scheme, the Layperson Controllers submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire, through the Provider Defendants, false and fraudulent claims and information in which the Layperson Controllers concealed that the charges submitted were for services provided pursuant to a fraudulent predetermined treatment protocol;

(iii)   Pursuant to the scheme, the Layperson Controllers submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire, through the Provider Defendants, false and fraudulent claims and information in which the Layperson Controllers falsely represented that the testing they administered was medically necessary for the care of Insureds;

(iv)    Pursuant to the scheme, the Layperson Controllers submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire, through the Provider Defendants, false and fraudulent claims and information in which the Layperson Controllers falsely represented that the services that the Provider Defendants billed for had been administered by their respective Nominal Owners or by Jean-Gilles, when in fact the services were administered by independent contractors;

(v)     Pursuant to the scheme, the Layperson Controllers submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire, through the Provider Defendants, false and fraudulent claims and information in which the Defendants falsely concealed that the testing services had been provided at the direction of unlicensed laypersons;

(vi)    Pursuant to the scheme, the Layperson Controllers submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire, through the Provider Defendants, false and fraudulent claims and information in which the Defendants falsely represented that the Provider Defendants were owned, managed and controlled by licensed healthcare professionals and were properly formed and operated under the New York Business Corporation Law;

(vii)   Pursuant to the scheme, the Layperson Controllers submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire, through the Provider Defendants, false and fraudulent claims and information in which the Defendants concealed the fact that the Provider Defendants, with the assistance of the Layperson Controllers, had illegal kickback and referral arrangements with referring healthcare providers and/or clinic controllers at numerous No-Fault Clinics throughout the New York metropolitan area; and

(viii)  For the purpose of executing this scheme and artifice to defraud, the Layperson Controllers submitted, or caused to be submitted, such false and fraudulent claims and information to State Farm Mutual and State Farm Fire by use of the mail caused State Farm Mutual and State Farm Fire to make payments for said fraudulent claims.

327.    The Transient Diagnostic Testing Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which the Defendants operate the Transient Diagnostic Testing Enterprise and acts of mail fraud therefore are essential for the Transient Diagnostic

Testing Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Provider Defendants to the present day, as well as the fact that at least some of the healthcare practices within the Transient Diagnostic Testing Enterprise have ceased operation only to begin submitting fraudulent billing again at a later date.

328.    A list of various mailings constituting a substantial number of the requisite predicate acts is annexed hereto as Exhibits "2" through "31." Each such mailing was made in furtherance of the mail fraud scheme.

329.    The Transient Diagnostic Testing Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to State Farm Mutual and State Farm Fire), by creating and maintaining patient files and other records, by negotiating and executing various facility lease agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance payments, by facilitating payments stemming from the illegal kickback and referral arrangements, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

330.    The Transient Diagnostic Testing Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to State Farm Mutual and State Farm Fire (and likely other automobile insurers). These inherently unlawful

acts are taken by the Transient Diagnostic Testing Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from State Farm Mutual and State Farm Fire (and likely other automobile insurers) through fraudulent no-fault billing.

331.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of the above-described conduct in that they have paid at least $1,593,000.00 pursuant to the fraudulent bills submitted in furtherance of the Transient Diagnostic Testing Enterprise.

332.    By reason of their injuries, State Farm Mutual and State Farm Fire are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**Against the Provider Defendants, Nominal Owners, Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10**
**(Violation of 18 U.S.C. § 1962(d))**

333.    State Farm Mutual and State Farm Fire incorporate, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

334.    The Transient Diagnostic Testing Enterprise is an ongoing association-in-fact "enterprise," as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

335.    The Provider Defendants, Nominal Owners, Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10 are associated with the Transient Diagnostic Testing Enterprise.

336.    Each of the Provider Defendants, Nominal Owners, Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10 knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Transient

Diagnostic Testing Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, as detailed in the paragraphs above.  A list of various mailings constituting a substantial number of the requisite predicate acts is annexed hereto as Exhibits "2" through "31." Each such mailing was made in furtherance of the mail fraud scheme.

337.    Each of the Provider Defendants, Nominal Owners, Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud State Farm Mutual and State Farm Fire of money) by: (i) submitting or facilitating the submission of the fraudulent charges to State Farm Mutual and State Farm Fire; and/or (ii) siphoning the proceeds of the fraudulent scheme, laundering those proceeds, and/or converting the insurance payments into cash.

338.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of the above-described conduct in that they have paid at least $1,593,000.00 pursuant to the fraudulent bills submitted in furtherance of the Transient Diagnostic Testing Enterprise.

339.    By reason of their injuries, State Farm Mutual and State Farm Fire are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against the Layperson Controllers, Provider Defendants, and Nominal Owners**
**(Common Law Fraud)**

340.    State Farm Mutual and State Farm Fire incorporate, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

341.    The Layperson Controllers, Provider Defendants, and Nominal Owners knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire and concealed material facts from State Farm Mutual and State Farm Fire in the course of their submission of hundreds of fraudulent charges and supporting documentation seeking payment for the Fraudulent Services delivered and billed through the Provider Defendants.

342.    The false and fraudulent statements of material fact and acts of fraudulent concealment include representations in every claim submitted or caused to be submitted by the Layperson Controllers, Provider Defendants, and Nominal Owners that: (i) the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed pursuant to a pre-determined protocol directed and controlled by unlicensed individuals; (ii) the billing appropriately reflected the level of services performed, when in fact the billing codes used for the Fraudulent Services and the manner in which the services were described misrepresented and exaggerated the level of services purportedly provided; (iii) the Provider Defendants were in compliance with all material licensing laws and therefore eligible to collect no-fault benefits pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12), when in fact the Provider Defendants were not eligible to collect no-fault benefits because the Provider Defendants were owned, operated, and controlled by the Layperson Controllers; and (iv) the Provider Defendants were in compliance with all material licensing laws and therefore eligible to collect no-fault benefits pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Provider Defendants were not eligible to collect no-fault benefits because the Layperson Controllers, Provider Defendants, and Nominal Owners were parties to illegal kickback and referral arrangements associated with the Provider Defendants' operation from the No-Fault Clinics; and (v) the billed-for services were

provided by Jean-Gilles or the respective Provider Defendants' Nominal Owners, when in fact the billed-for services were provided by independent contractors.

343.    The Layperson Controllers, Provider Defendants, and Nominal Owners intentionally made, or caused to be made, the above-described false and fraudulent statements and concealed material facts to induce State Farm Mutual and State Farm Fire to pay charges submitted through the Provider Defendants that were not compensable under the No-Fault laws.

344.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of the above-described conduct in that they have paid at least $1,677,000.00 pursuant to the fraudulent bills submitted through the Provider Defendants.

345.    Accordingly, by virtue of the foregoing, State Farm Mutual and State Farm Fire are entitled to compensatory damages—to be apportioned by the court or at trial with respect to each Provider Defendant and Nominal Owner based on the damages attributable to them regarding the claims in Exhibits "1" through "31"—together with interest and costs, and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against all Defendants
### (Unjust Enrichment)

346.    State Farm Mutual and State Farm Fire incorporate, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

347.    As set forth above, Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of State Farm Mutual and State Farm Fire.

348.    When State Farm Mutual and State Farm Fire paid the bills and charges submitted by or on behalf of the Provider Defendants for No-Fault Benefits, they reasonably believed that

they were legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

349.    The Defendants have been enriched by State Farm Mutual's and State Farm Fire's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

350.    The Defendants' retention of State Farm Mutual's and State Farm Fire's payments violates fundamental principles of justice, equity, and good conscience.

351.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, and with respect to each Provider Defendant and Nominal Owner based on the damages attributable to them regarding the claims in Exhibits "1" through "31," but in no event less than a total amount of $1,677,000.00.

### FIFTH CAUSE OF ACTION
**Against the Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10**
**(Aiding and Abetting Fraud)**

352.    State Farm Mutual and State Farm Fire incorporate, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

353.    The Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10 knowingly aided and abetted the fraudulent scheme that was perpetrated on perpetrated on State Farm Mutual and State Farm Fire by Defendants.

354.    The acts of the Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10 in furtherance of the fraudulent scheme include knowingly laundering the proceeds obtained via the submission of fraudulent billing through the Provider Defendants, converting the proceedings into cash under false pretenses, and generating fraudulent billing for submission to State Farm Mutual and State Farm Fire at the direction of the Layperson Controllers

in order to effectuate the Defendants' scheme

355.    The conduct of the Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10 was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, including knowingly laundering the proceeds obtained via the submission of fraudulent billing through the Provider Defendants, converting the proceedings into cash under false pretenses, and generating fraudulent billing for submission to State Farm Mutual and State Farm Fire, the Layperson Controllers would not had the full opportunity to obtain payments from State Farm Mutual and State Farm Fire and to reap the financial benefits of their fraudulent scheme.

356.    The Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10 aided and abetted the fraudulent scheme in a calculated effort to induce State Farm Mutual and State Farm Fire into continuing to pay charges to the Provider Defendants for medically unnecessary Fraudulent Services or illusory services that were not compensable under the No-Fault Laws, because they sought to conceal the true nature of the fraudulent scheme and continue profiting through the fraudulent scheme.

357.    The conduct of the Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10 caused State Farm Mutual and State Farm Fire to pay up to a total of more than $1,677,000.00 pursuant to the fraudulent bills submitted through the Provider Defendants.

358.    Accordingly, by virtue of the foregoing, State Farm Mutual and State Farm Fire are entitled to compensatory damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
**Against the Provider Defendants**

**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

359.    State Farm Mutual and State Farm Fire incorporate, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

360.    There is an actual case in controversy between State Farm Mutual and State Farm Fire and the Provider Defendants regarding more than $5,905,000.00 in pending billing the Provider Defendants have submitted to State Farm Mutual and State Farm Fire.

361.    The Provider Defendants have no right to receive payment for any pending bills submitted to State Farm Mutual and State Farm Fire because they were operated and controlled by laypersons in violation of New York law and, therefore, are ineligible to receive No-Fault Benefits.

362.    The Provider Defendants have no right to receive payment for any pending bills submitted to State Farm Mutual and State Farm Fire because the Fraudulent Services were not medically necessary but were provided pursuant to a pre-determined protocol directed and controlled by unlicensed individuals, which financially enriched the Defendants.

363.    The Provider Defendants have no right to receive payment for any pending bills submitted to State Farm Mutual and State Farm Fire because the billing codes used for the Fraudulent Services misrepresented and/or exaggerated the nature and/or level of services that purportedly were provided to inflate and/or unbundle the charges submitted to State Farm Mutual and State Farm Fire.

364.    The Provider Defendants have no right to receive payment for any pending bills submitted to State Farm Mutual and State Farm Fire because the Provider Defendants engaged in illegal kickback and referral arrangements that contravened New York law and, therefore, are ineligible to bill for or to collect No-Fault Benefits.

365.    The Provider Defendants have no right to receive payment for any pending bills for services submitted to State Farm Mutual and State Farm Fire under the names of the Provider Defendants to the extent the services were provided by independent contractors and not employees of the Provider Defendants.

366.    Accordingly, State Farm Mutual and State Farm Fire request a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to State Farm Mutual and State Farm Fire.

**JURY DEMAND**

367.    Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury.

**PRAYER FOR RELIEF**

**WHEREFORE**, State Farm Mutual and State Farm Fire demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Layperson Controllers, compensatory damages in favor of State Farm Mutual and State Farm Fire in an amount to be determined at trial but in excess of $1,593,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

B.    On the Second Cause of Action against the Provider Defendants, Nominal Owners, Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10, compensatory damages in favor of State Farm Mutual and State Farm Fire in an amount to be determined at trial but in excess of $1,593,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against the Layperson Controllers, Provider Defendants, and Nominal Owners, compensatory damages in favor of State Farm Mutual and State Farm Fire in an amount to be determined at trial but in excess of $1,677,000.00, together with costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Cause of Action against all Defendants more than $1,677,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Cause of Action against the Transportation Corporations, Check Cashers, Zaretser, and John Doe Defendants 1-10, compensatory damages in favor of State Farm Mutual and State Farm Fire an amount to be determined at trial but in excess of $1,677,000.00, together with costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to State Farm Mutual and State Farm Fire.

Dated: March 22, 2022

RIVKIN RADLER LLP


By:   _/s/ Barry I. Levy_
        Barry I. Levy (BL 2190)
        Ryan Goldberg (RG 7570)
        John P. Mulvaney (JM 0154)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*